**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

BERRY CAPITAL MANAGEMENT, LLC,

Debtor

Case No.  25-04002-5-JNC

Chapter 11

## EMERGENCY MOTION OF BROWN PELICAN FARMS LLC (1) TO COMPEL DEBTOR TO IMMEDIATELY ASSUME OR REJECT UNEXPIRED LEASE AND (2) FOR RELIEF FROM THE AUTOMATIC STAY TO TERMINATE UNEXPIRED LEASE AND ENFORCE REMEDIES

COMES NOW Brown Pelican Farms LLC ("Landlord"), by and through its undersigned counsel, pursuant to 11 U.S.C. § 365, and hereby files this motion (the "Motion"): (1) to Compel Debtor to Immediately Assume or Reject Unexpired Lease and for (2) for Relief from the Automatic Stay to Terminate Unexpired Lease and Enforce Remedies.  In support thereof, Landlord respectfully states as follows:

### INTRODUCTION

Landlord is the owner of approximately 393 acres of farmland commonly referred to as the "Winzeler Farm" in Bladen County, North Carolina.  In January 2022, Landlord, as landlord, entered into an agricultural lease with Berry Capital Management, LLC (the "Debtor"), as tenant, for the purpose of the Debtor growing and harvesting organize blueberries on the Winzeler Farm. The Debtor, in turn, contracted with Carolina Berry Group, LLC ("CBG") for CBG to grow, harvest and sell the blueberries. CBG was responsible for paying the Debtor a percentage of the farming revenues. The Debtor would then use those revenues to pay the rent due to Landlord under the agricultural lease.

The 2024 and 2025 crops grown by CBG did not generate any profits for its farming operations, which prevented CBG from paying any shared revenues to the Debtor. As a result, no monies were received by the Debtor from which to pay the 2024 and 2025 rent to Landlord. On or about May 22, 2025, First Bank, the senior secured lender of CBG, had David M. Mills appointed as the court-appointed receiver (the "Receiver") over the bulk of the assets of CBG, including the crops and proceeds thereof. The blueberry crop has been harvested and sold, and Mr. Mills is liquidating the remaining assets of CBG before making any distribution to creditors. As of the Petition Date, the Debtor has not contracted with another farmer to grow, harvest and sell the blueberries for the 2026 crop season, and none of the essential and necessary post-harvest pruning and maintenance to the blueberry bushes has been done. If the pruning and maintenance is not done immediately, there will be no 2026 blueberry crop. Upon information and belief, the Debtor does not have sufficient capital to perform the pruning and maintenance necessary to prepare the bushes for the 2026 crop season. Therefore, Landlord faces irreparable harm if the relief requested herein is not granted.

## JURISDICTION AND VENUE

1.     On October 10, 2025, Berry Capital Management, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.     The Debtor continues to operate its business and manage its property as debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

3.     The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this Motion is proper in this District pursuant to 28 U.S.C. §1409. This is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (G).

## THE AGRICULTURAL LEASE

4.      Landlord is a special purpose entity specifically organized for the purpose of owning and leasing certain land located in Bladen County, North Carolina and leasing some or all of such land for agricultural purposes.

5.      In 2022, Landlord purchased a parcel of land consisting of 1,496.99 gross acres, including approximately 392.97 farmable acres (the "Farmable Acres") located in Bladen County, North Carolina (the "Farm").

6.      The purpose for purchasing the Farm was for Landlord to lease the Farmable Acres to a tenant who would grow and harvest organic blueberries and pay Landlord land rent for the use of the Farmable Acres.

7.      On or about January 28, 2022, Landlord, as landlord, and the Debtor, as tenant, entered into the Agricultural Lease (the "Lease") whereby Landlord leased the Farm to the Debtor for the purpose of the Debtor growing and harvesting organic blueberries on the Farm.  A true and correct copy of the Lease is attached hereto as **Exhibit A** and incorporated herein by reference.

8.      The Debtor leased the Farm from Landlord for a term of ten (10) years beginning on the date Landlord closed on the purchase of the Farm, which occurred on January 28, 2022. Lease, at Section 1(b).

9.      The Debtor agreed to pay Landlord an annual base rent in an amount equal to the Base Property Value as of the Lease Commencement Date ($15,300,000.00) multiplied by the Lease Factor of eight percent (8%) per annum with annual Base Rent escalations of three percent (3%) annually (the "Base Rent").  Lease, at Section 2(a) and 2(a)(i).

10.     The Lease required the Debtor to pay the Base Rent on March 31st of the first year of the terms of the Lease and thereafter on August 31st in subsequent years.  Lease, at Section 2(a)(ii).

11.     The Base Rent due for 2024 was $1,298,542 and $1,337,498 for 2025. Lease, at Exhibit B thereto.

12.     The Lease specifically requires the Farm to be "continuously used and occupied by the Debtor for a bona fide agricultural purpose" and said bona fide agricultural purpose shall include "planting, fertilizing and harvesting organic blueberries and other operations incidental to commercial organic farming of blueberries." Lease, at Section 5(a).

13.     The Lease further requires the Debtor, at its sole cost and expense, to promptly make all repairs and maintenance necessary to maintain the property consistent with good agricultural practices for the production and processing of blueberries on the Farm, including winterizing and fertilizing, controlling and treating exotic, noxious and invasive vegetation, and maintaining the drainage systems by cleaning out ditches and slews and all cleaning and cutting necessary to maintaining water flow as existed at the time the Lease was commenced and consistent with good agricultural practices.  Lease, At Section 15(a).

14.     The Debtor subordinated all of its rights, title and interest under the Lease to the rights, title and interest of Landlord.  Lease, at Section 24.

**I.       The Farming Agreement**.

15.     The Lease further contemplates and requires the Debtor to enter into a Contract Farming Agreement (the "Farming Agreement") with CBG for CBG to be the farm operator and be responsible for cultivating, planting and harvesting the blueberry crop on the Farm.  Lease, at Section 5(b).

16.     Following the execution of the Lease, the Debtor and CBG entered into the Farming Agreement for CBG.

17.     Under the Farming Agreement, the Debtor granted CBG a revocable license for the sole purpose of CBG cultivating, planting and harvesting blueberries on the Farm. <u>Farming Agreement</u>, at Section 2(a).

18.     CBG was required under the Farming Agreement to perform all the necessary services and efforts to plant, grow and harvest the blueberries and to bring them to a position where they are ready for selling.  <u>Farming Agreement</u>, at Section 6(a).

19.     In exchange for the license to cultivate and harvest the blueberries, CBG agreed to share with BCM a percentage of the gross sales from the blueberries.  <u>Farming Agreement</u>, at Section 3(a).

20.     CBG was required to have the appropriate insurance to cover the crop.  <u>Farming Agreement</u>, at Section 5.

21.     CBG farmed and grew the blueberry crop on the Farm under the Farming Agreement with the Debtor until the Receiver was appointed in May 2025.

22.     The Receiver completed the growing, harvesting and selling of the 2025 blueberry crop and is in the process of selling the real property and personal property assets of CBG.

23.     On October 9, 2025, the Debtor terminated the Farming Agreement with CBG. A copy of the termination letter is attached as **Exhibit B** and incorporated herein by reference.

24.     On October 10, 2024, the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.

## RELIEF REQUESTED

25.     By this Motion, the Landlord seeks an order (i) compelling the Debtor to immediately assume or reject the Lease and (ii) granting Landlord relief from the automatic stay under 11 U.S.C. § 362(d)(1) to terminate the Lease and avail itself of all available remedies under the Lease.

## ARGUMENT

### A.    DEBTOR SHOULD BE COMPELLED TO IMMEDIATELY ASSUME OR REJECT THE LEASE.

26.     11 U.S.C. § 365(d)(2) states, in pertinent part:

> "In any case under . . .chapter 11 . . .of this title, the trustee may assume or reject an executor contract or unexpired lease . . .of personal property of the debtor at any time before the confirmation of a plan <u>but the court, on request of any party to such contract or lease, may order the trustee to determine within a specific period of time whether to assume or reject such contract or lease</u>."

11 U.S.C. §365(d)(2) (emphasis added).

27.     Congress intended this provision to "prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate." Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1079 (3d Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

28.     Although the Bankruptcy Code provides chapter 11 debtors with a "breathing space" within which to determine whether a particular executory contract should be assumed or rejected, such "breathing space . . . is not without limits." In re Enron Corp., 279 B.R. 695, 702 (Bankr. S.D.N.Y. 2002). In assessing a section 365(d) motion, a court must consider not only the debtor's need for "breathing room," but also the non-debtor party's need for certainty and stability. The limit placed on the time for the debtor's assumption or rejection determination by case law and commentators is "reasonableness." See e.g. In re Teligent, Inc., 268 B.R. 723, 738–

39 (Bankr. S.D.N.Y. 2001). The determination of what constitutes a reasonable time to assume or reject a particular lease is within the bankruptcy court's discretion and has to be decided in light of the particular facts of each case.  In re G-I Holdings, Inc., 308 B.R. 196, 213 (Bankr. D.N.J. 2004) ("What constitutes a reasonable time is left to the bankruptcy court's discretion in the light of the circumstances of the particular case."); In re Adelphia Comm 'cns Corp., 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003); In re Physician Health Corp., 262 B.R. 290, 292 (Bankr. D. Del. 2001); In re St. Mary Hosp., 89 B.R. 503, 513 (Bankr. E.D. Pa. 1988); Matter of Dunes Casino Hotel, 63 B.R. 939, 949 (D.N.J. 1986) ("In determining what constitutes a reasonable time within which a debtor should assume or reject a contract, the court should consider a number of factors."). The court should consider a non-debtor contract party's right to certainty as to the property and obligations under the executory lease in exercising its discretion. See In re Physician Health Corporation, 2001 Bankr. LEXIS 561, Slip Op. at 4 (Bankr. D. Del. 2001).

29. Upon a creditor's request, Bankruptcy Courts consider the following factors in determining what constitutes a reasonable time: (1) the nature of the interests at stake; (2) the balance of the harm to the parties; (3) the good to be achieved; and (4) the safeguards afforded to the parties.  Giant Markets, 28 B.R. at 336 (shortening debtor's time to assume or reject leases where debtor had failed to pay its rent obligations on the lease timely). "These factors are not exhaustive, and depending on the circumstances, there may be other factors that a bankruptcy court should consider." In re Hawker Beechcraft, Inc., 483 B.R. at 429 (citing South Street Seaport Limited Partnership v. Burger Boys, Inc. (In re Burger Boys, Inc.), 94 F.3d 755, 761 (2d Cir.1996)).

30. Where there was no indication that a debtor could remain current on its post-petition obligations under an executory contract or unexpired lease, courts have not hesitated to

shorten the debtor's time to assume or reject the lease or contract to protect the creditor's interests. In re Taber Farm Associates, 115 B.R. 455, 457 (Bankr. S.D.N.Y. 1990) (shortening debtor's time to assume or reject unexpired lease where delay required creditor to shoulder significant financial expenses relating to the property while also precluding creditor from seeking alternative lessees); In re Petroleum Products, Inc., 72 B.R. 739, 747 (Bankr. D. Kan. 1987) (shortening debtor's time to assume or reject unexpired lease where debtor had failed to pay post-petition rent and had given no indication that it was capable of paying such rent); In re Beker Industries Corp., 64 B.R. 890 (Bankr. S.D.N.Y. 1986) (if the debtor desires further time to assume or reject an unexpired lease, it must pay its post-petition obligations with respect to such contract).

31.     Here, shortening the Debtor's time to assume or reject the Lease is warranted. The balance of harm to the parties tips entirely toward the Landlord. Not only has the Landlord been significantly harmed by Debtor's failure to fulfill its maintenance obligations, but the window of time in which the post-harvest pruning must be completed is rapidly closing. As the Court knows, fall is in full swing and temperatures are dropping. Any further delay in the post-harvest pruning and maintenance of the blueberry bushes will destroy the 2026 crop. Should the Debtor wait the allotted 120-days to make a decision, the opportunity for post-harvest pruning and maintenance will have passed, any potential for a 2026 crop will be foregone, and Debtor would suffer no harm from its ultimate rejection of the Lease should it elect to do so. In that event, Creditor would shoulder significant damages solely caused by Debtor's delay. The balance of the harms clearly weighs in the favor of the Landlord.

32.     Further, there are essentially no safe guards for either the Landlord or the Debtor against the destruction of the 2026 crop should the Debtor not immediately assume or reject the

lease so post-harvest pruning can be performed. If Debtor is permitted to utilize the 120-day period to assume or reject the Lease, the viability of a 2026 crop will have passed, thereby causing irreparable harm to the blueberry bushes on the Farm.  Neither the Landlord, in the event the Lease is ultimately rejected, nor the Debtor, in the event the Lease is ultimately assumed, will be able to benefit from a 2026 crop.

33.     Moreover, and for similar reasons, it is in the best interest of all parties for the Debtor to make an expedited decision on assumption and rejection. Regardless of eventual assumption or rejection, the 2026 crop is certain to fail without the necessary post-harvest pruning and maintenance. Should Debtor intend to utilize the 2026 crop to support its reorganization, the Debtor need make that decision now before its opportunity to even grow that crop has passed. If the Debtor cannot utilize the 2026 crop, the Landlord should be afforded the opportunity to mitigate the damage it will certainly sustain if the post-harvest pruning and maintenance is not performed by regaining possession of the property and doing that maintenance itself.

34.     Moreover, the Debtor has failed to perform any of its monetary obligations under the Lease for the 2024 and 2025 crop seasons and has no ability to cure those amounts. With no hope to do so, the Landlord—and the 2026 crop—is essentially be held hostage by the Debtor's delay.

**B.      IF THE LEASE IS REJECTED THIS COURT MUST GRANT LANDLORD RELIEF FROM THE AUTOMATIC STAY TO TERMINATE THE LEASE AND ENFORCE ITS RIGHTS AND REMEDIES UNDER THE LEASE.**

35.     It is clear that rejection of an executory contract or unexpired lease is not a termination of such lease or contract but instead is equivalent to a breach thereof.   Udell v. Standard Carpetland USA, Inc., 149 B.R. 908, 911 (N.D.Ind.1993); Societe Nationale Algerienne v. Distrigas Corp., 80 B.R. 606 (D.Mass.1987);  In re Ames Dept. Stores, Inc., 148

B.R. 756 (Bankr.S.D.N.Y.1993); <u>Blackburn v. Sec. Pacific Credit Corp.</u>, 88 B.R. 273, 276 (Bankr.S.D.Cal.1988).

36.     Subsequent to an executory contract or unexpired lease being rejected, and effectively breached, the focus must turn to what remedies the counter-party has pursuant to the underlying lease.  <u>See In re Austin Develop. Co.</u>, 19 F.3d 1077 (5th Cir. 1994) (holding that rejection and termination are not synonymous terms under state law).

37.     To the extent this Court approves the rejection of the Lease, the Landlord seeks relief from the automatic stay to immediately pursue its rights and remedies under the Lease. Courts have permitted general unsecured creditors relief from the automatic stay in order to pursue their rights.  <u>See  In re U.S. Physicians, Inc.</u>, 236 B.R. 593, 605-606 (Bankr. E.D. Pa. 1999); <u>Mayer Pollock Steel Corp. v. London Salvage & Trading Co., Ltd. (In re Mayer Pollock Steel Corp.)</u> 157 B.R. 952, 966 (Bankr. E.D. Pa. 1993); <u>In re Stranahan Gear Co., Inc.</u>, 67 B.R. 834, 837-838 (Banrk. E.D. Pa. 1986).

38.     Section 362(d)(1) of the Bankruptcy Code provides that the automatic stay must be terminated, annulled, modified, or conditioned for "cause," including lack of adequate protection.  The Debtor bears the burden of proving that cause does not exist to lift the automatic stay. §11 U.S.C. §362(g).

39.     As set forth in further detail above, the Landlord will suffer significant harm as a result of the Debtor's failure to immediately assume or reject the Lease.  Allowing the Landlord to terminate the Lease after rejection is the next logical step in the process of doing what is necessary to protect the integrity and value of the blueberry bushes to ensure a viable crop in 2026.

40.     Furthermore, the Landlord has not been adequately protected in its interests in the Lease.  Despite having months since the completion of the harvesting of the 2025 crop to complete the necessary maintenance of the blueberry bushes, the Debtor has failed to do this vital function, and the time for doing it is past the critical stage.  As of the filing of this Motion, Landlord has not received any adequate protection nor adequate assurance that the Debtor can cure the arrears or perform in the future under the Lease.  This lack of adequate protection and lack of adequate assurance of a cure and future performance are further justification for the Landlord to be granted relief from the automatic stay.

41.     Accordingly, the Landlord respectfully requests that it be granted relief from the automatic stay under §362(d)(1) of the Bankruptcy Code to terminate the Lease and pursue the remedies available to it under the Lease.

42.     In addition, if this Court is inclined to grant the Landlord's request for relief from the automatic stay, the Landlord requests that the order granting such relief expressly waive the provisions of Bankruptcy Rule 4001(a)(3) to enable it to immediately terminate the Lease, promptly take control of the Farm, remove the Debtor and its assets therefrom and exercise all other rights and remedies under the Lease.

43.     A proposed Order granting the Landlord's Motion is attached hereto as **Exhibit C**.

**WHEREFORE,** the Landlord respectfully requests that this Court enter an order:  (i) compelling the Debtor to immediately assume or reject the Lease; (ii) either requiring the Debtor to cure all outstanding arrearage or, in the alternative, granting the Landlord relief from the automatic stay to terminate the Lease and immediately terminate the Lease, promptly take control of the Farm, remove the Debtor and its assets therefrom and exercise all other rights and

remedies under the Lease; and (iii) granting the Landlord further relief that this Court deems just and proper.

Dated:  October 15, 2025

WOMBLE BOND DICKINSON (US) LLP

By:   /s/ James S. Livermon, III
JAMES S. LIVERMON, III
NC State Bar No. 26492
Charlie.Livermon@wbd-us.com
EUDORA F.S. ARTHUR
NC State Bar No. 59854
Dorie.Arthur@wbd-us.com.
555 Fayetteville Street, Suite 1100
Raleigh, NC  27601
Telephone: (919) 755-2148

*Attorneys for Brown Pelican Farms LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

IN RE:

BERRY CAPITAL MANAGEMENT, LLC,

Debtor

Case No.  25-04002-5-JNC

Chapter 11

## NOTICE OF MOTION ON SHORTENED TIME

The party represented by counsel below has filed papers with the court to move the court for an order to compel the Debtor to assume or reject a lease and for relief from the automatic stay.

Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)

If you do not want the court to grant the motion compelling the Debtor to assume or reject the lease and to grant relief from stay, or if you want the court to consider your views on the motion, then on or before October 21 at 12:00 p.m., unless otherwise ordered, you or your attorney must file with the court, pursuant to Local Rule 9013-1 and 9014-1, a written response, an answer explaining your position, and a request for hearing at:

> United States Bankruptcy Court
> Post Office Box 791
> Raleigh, NC 27602

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.

You must also mail a copy:

> James S. Livermon, III, Esq.
> WOMBLE BOND DICKINSON (US) LLP
> 555 Fayetteville St., Suite 1100
> Raleigh, NC 27601
>
> David J. Haidt, Esq.
> AYERS & HAIDT, PA
> Post Office Box 1544
> New Bern, NC 28562

Brian Behr, Esq.
BANKRUPTCY ADMINISTRATOR
434 Fayetteville Street, Suite 640
Raleigh, NC 27601

If a response and a request for hearing are filed in writing on or before the date set above, a hearing will be conducted on the motion at a date, time and place to be later set and all parties will be notified accordingly.

If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.

Dated:  October 15, 2025                 WOMBLE BOND DICKINSON (US) LLP

                                    By:    /s/ James S. Livermon, III
                                           JAMES S. LIVERMON, III
                                           NC State Bar No. 26492
                                           Charlie.Livermon@wbd-us.com
                                           EUDORA F.S. ARTHUR
                                           NC State Bar No. 59854
                                           Dorie.Arthur@wbd-us.com.
                                           555 Fayetteville Street, Suite 1100
                                           Raleigh, NC  27601
                                           Telephone: (919) 755-2148

                                    *Attorneys for Brown Pelican Farms LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, of Womble Bond Dickinson (US) LLP, hereby certify:

That I am more than eighteen (18) years of age;

That on this day, I served a copy of the foregoing Emergency Motion of Brown Pelican Farms LLC to (1) Compel Debtor to Immediately Assume or Reject Unexpired Lease and for (2) Relief from the Automatic Stay to Terminate Unexpired Lease and Enforce Remedies on:

> Berry Capital Management II, LLC
> 100 Elks Club Road
> Brevard, NC 28712-4842

by depositing the same in the United States mail, first class, postage prepaid.

That on this day, the foregoing Emergency Motion of Brown Pelican Farms LLC to (1) Compel Debtor to Immediately Assume or Reject Unexpired Lease and for (2) Relief from the Automatic Stay to Terminate Unexpired Lease and Enforce Remedies was served by electronic means through the court's CM/ECF service on:

> David J. Haidt, Esq.
> Attorney for Debtor
> *Via CM/ECF*

> Brian C. Behr, Esq.
> Bankruptcy Administrator
> *Via CM/ECF*

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  October 15, 2025          WOMBLE BOND DICKINSON (US) LLP

By:    /s/ James S. Livermon, III
       JAMES S. LIVERMON, III
       NC State Bar No. 26492
       Charlie.Livermon@wbd-us.com
       EUDORA F.S. ARTHUR
       NC State Bar No. 59854
       Dorie.Arthur@wbd-us.com.
       555 Fayetteville Street, Suite 1100
       Raleigh, NC  27601
       Telephone: (919) 755-2148

       *Attorneys for Brown Pelican Farms LLC*

# EXHIBIT A

<u>AGRICULTURAL LEASE</u>

THIS AGRICULTURAL LEASE ("**Lease**") is made effective as of January 28, 2022 (the "**Effective Date**"), by and between **Brown Pelican Farms LLC**, a Delaware limited liability company ("**Landlord**"), and **Berry Capital Management**, LLC, a North Carolina limited liability company ("**Tenant**").

W I T N E S S E T H:

WHEREAS, Landlord owns that certain parcel of land consisting of approximately 1,496.99 gross acres, including approximately 392.97 farmable acres ("**Farmable Acres**") located in Bladen County, North Carolina, as more particularly described in <u>Exhibit A</u> attached hereto and made a part hereof, together with all buildings and other improvements located thereon, and all privileges, rights, easements appurtenant to the land, including without limitation water rights and water use permit rights, (collectively, the "**Premises**"); and

WHEREAS, Tenant desires to lease the Premises from Landlord for the purposes of growing and harvesting organic blueberries upon said Premises; and

WHEREAS, Landlord desires to lease the Premises to Tenant based on the terms and conditions set forth in this Lease;

NOW, THEREFORE, in consideration of the mutual covenants, agreements, and representations contained in this Lease, the parties agree to enter into this transaction based on the foregoing recitals, and the following terms:

1.     <u>PREMISES AND TERM</u>.

(a)   <u>Premises</u>. Upon and subject to the terms and conditions of this Lease, Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the Premises. The Farmable Acres of the Premises, currently containing approximately 392.97 acres, shall be used by the Tenant for the growing and harvesting of organic blueberries. An additional portion of the Premises containing approximately 150 acres (the "**Additional Blueberry Acres**"), shall be developed for the purposes of growing and harvesting organic blueberries on a mutually agreeable schedule to Landlord and Tenant with such development to be completed for the 2023 harvesting season. In addition to the Additional Blueberry Acres, approximately 400 additional acres within the Premises (the "**Additional Farmable Acres**") shall be developed and used by the Tenant for the growing and harvesting of blueberries or other crops as approved in writing in advance by Landlord. The acres contained within the Farmable Acres, Additional Blueberry Acres and Additional Farmable Acres shall be calculated based on Net Planted Acres. "**Net Planted Acres**" means the total acres of the Real Property that are planted to crop, measured as bush corner to bush corner less farm roads, turn rows, field roads, and drainage ways/ditches.

(b)   <u>Term</u>. The term of this Lease shall be for a period of ten (10) years and shall commence on the day of the Closing (defined below) (the "**Commencement Date**") and expire on December 31, 2031 (the "**Expiration Date**") (the "**Term**"), unless extended or otherwise terminated pursuant to the provisions hereof. The executed Lease shall be delivered, along with all other documents required by this Lease, to Landlord on or before January 13, 2022. This Lease shall only

<div align="center">1</div>

become effective in the event Closing has occurred by February 28, 2022.

(c)    Option to Extend. Provided that Tenant has not been in default of this Lease during the original Term of this Lease, Tenant shall have the option to extend the term and all the provisions contained in this Lease for one (1) additional period of five (5) years ("**Option**") commencing January 1, 2032 and expiring December 31, 2036 (the "**Extended Term**").  All terms, covenants and conditions of this Lease shall remain unmodified and in full force and effect during the Extended Term, except that the Base Rent shall be as adjusted as set forth below, and once exercised, Tenant shall have no further rights or options to extend the Term.  Tenant's Option to extend is contingent upon the following terms and conditions:

(i)    Writing. Notice of exercise of the Option ("**Option Notice**") shall be in writing and provided to Landlord not later than eighteen (18) months prior to the expiration of the Term.  The Option may be exercised only if Tenant is not in default at the time of the delivery of the Option Notice and at the commencement of the Extended Term.

(ii)    Extended Term Base Rent. The annual Base Rent payments for the Extended Term if the Option is exercised shall be adjusted effective on January 1, 2032, the commencement date of the Extended Term, as set forth in Section 2(a)(iii) below.

(iii)    Personal Right. The Option to extend granted to Tenant under this Lease is personal, and Tenant shall have no right to assign or transfer the Option either separately from or together with a transfer of Tenant's leasehold interest.

2.    RENT.

(a)    Base Rent.   Tenant covenants and agrees to pay to Landlord, promptly when due, without notice of demand and without deduction or set-off of any amount for any reason whatsoever, annual "**Base Rent**" during the Term in an amount equal to the Base Property Value (as the same may exist from time to time) multiplied by the Lease Factor (as the same may exist from time to time), as more particularly set forth below.

(i)    Lease Factor and Base Property Value.   The Lease Factor for the original Term, shall be eight percent (8%) per annum.  As of the Commencement Date of the Lease, the Base Property Value shall be as set forth on **Exhibit B** attached hereto and incorporated herein by reference. On January 1 of each year during the original Term and the Extended Term, if applicable, the Base Property Value shall be increased to an amount equal to one hundred three percent (103.0%) of the immediately preceding Base Property Value.  This increase is intended to be compounded throughout the Term and Extended Term, and this increase in Base Property Value shall result in an increase in the amount of Base Rent to be paid during each year of the Term and Extended Term.  In addition, commencing on the 6th anniversary of the Commencement Date, Base Rent shall be adjusted in accordance with the terms and conditions of Section 2(a)(iii) below.

(ii)    Due Date for Base Rent Payment.   Tenant shall make annual payments of Base Rent, with payments due by March 31st of the first year of the Term and August 31st of each subsequent year of the Term, in the amounts and on the schedule set forth on **Exhibit B** attached hereto and incorporated herein by reference. Notwithstanding the

foregoing, provided Tenant has provided the LOC 1 in accordance with Section 2(c)(i), the first payment of Base Rent due on March 31, 2022 shall be delayed until August 31, 2022; provided, however, if an Event of Default (as defined below) occurs, such delayed Base Rent shall be immediately due and payable.

(iii)    Base Rent Adjustment.  The annual Base Rent payments effective January 1, 2027 through the remainder of the original Term and at the start of any Extended Term (each such date, an "**Adjustment Date**") shall be adjusted as set forth herein.

As of an Adjustment Date, the Base Property Value shall be adjusted to be equal to the greater of (1) the then Fair Market Value of the Premises, as that term is defined below; or (2) an amount equal to one hundred ten percent (110.0%) of the immediately preceding Base Property Value.

(iv)    Fair Market Value.  Fair Market Value, for the purposes of this Lease, shall be the fee simple appraised value of the Premises prepared by an independent licensed appraiser according to the Uniform Standards of Professional Appraisal Practice.  The appraiser shall be selected and jointly hired by the Landlord and Tenant.  Landlord and Tenant shall split the costs of such appraisal.  The Fair Market Value shall be determined not more than six (6) months prior to the applicable Adjustment Date (the "**Determination Date**").

In the event Landlord and Tenant, using good faith efforts, cannot agree on a single appraiser to determine Fair Market Value within forty-five (45) days prior to the Determination Date, Landlord and Tenant shall, no later than fifteen (15) days after the end of such forty-five (45) day period, each designate an appraiser licensed in the state of North Carolina with at least ten (10) years' experience appraising agricultural property in Eastern North Carolina.  If one party does not timely appoint an appraiser, then the appraiser appointed by the other party shall promptly appoint a similarly qualified appraiser for such party.  Such two appraisers shall appoint a third similarly qualified appraiser within ten (10) days after their appointment.  If the two appraisers are unable to agree upon a third appraiser, the appraiser shall be appointed by the presiding judge of the county court for the county in which the Premises is located, or, if he or she refuses to act, by any judge having jurisdiction over the parties. Each of the two initial appraisers shall prepare a written appraisal of the Fair Market Value and submit such appraisals to the third appraiser within ten (10) days after the appointment of the third appraiser.  Within ten (10) days after the receipt of such appraisals and in any event on or before the Determination Date, the third appraiser shall select one appraisal as the Fair Market Value.  Each party will bear the cost of its appraiser and shall share equally the cost of the third appraiser.

In the event the Fair Market Value shall not have been determined as of Determination Date and the applicable Adjustment Date has passed, then the Tenant shall pay Annual Base Rent based upon Landlord's determination of the Base Property Value and, when the Fair Market Value is actually determined in accordance with this Section, the parties shall reconcile  the amounts previously paid, and either party owing a sum to the other shall pay such amounts within thirty (30) days after the final determination of the Fair Market Value. In addition to the foregoing, Base Property Value and Annual Base Rent shall continue to be subject to adjustment during the Term and any Extended Term as otherwise provided herein.

3

(b)  <u>Crop Proceeds Rent</u>.  In addition to Base Rent, Tenant shall pay to Landlord an amount equal to three percent (3%) of Tenant's Crop Proceeds (defined below) from the sale of all crops harvested during a given calendar year during the Term ("**Crop Proceeds Rent**"). Crop Proceeds Rent for the then concluding calendar year shall be due and payable on January 1 of the following year during the Term (including any extension of the term pursuant to the exercise of the Option by Tenant). For example, on January 1, 2023, Crop Proceeds Rent in an amount equal to three percent (3%) of the Crop Proceeds earned from crops harvested between December 31, 2021 and December 31, 2022, shall be due and payable to Landlord. For the sake of clarification, Crop Proceeds Rent payment dates are more particularly set forth on <u>Exhibit B</u> attached hereto. If any crops harvested during any particular calendar year are not sold by December 31 of such calendar year**,** Tenant shall deliver prompt written notice of the same to Landlord, and the portion of Crop Proceeds Rent due to Landlord from the sale of those then unsold crops shall be due within fifteen (15) days after Tenant's receipt of payment for the sale of the same. Notwithstanding anything in this Lease to the contrary, Tenant's obligation to make any payment of Crop Proceeds Rent generated during the Lease Term shall survive the termination of this Lease at its expiration or otherwise.

For the purposes hereof, "**Crop Proceeds**" shall mean the gross proceeds from the sale of the first (1st) eight thousand five hundred (8,500) pounds of blueberries per Farmable Acre sold at a minimum baseline price of $3.50 per pound for the fresh market harvested on the Premises, including where applicable Crop Proceeds Insurance (as defined below) and other proceeds from insurance for crop loss or other damage, any of which of the aforementioned shall be received by or payable to Tenant and relate, directly or indirectly, to farming activities on the Premises during the Lease Term as determined from Tenant's compiled financial statements and settlement sheets from a third party fruit marketer.  If less than eight thousand five hundred (8,500) pounds per Farmable Acre are sold to the fresh market, but additional pounds are sold to the processed market, then the additional revenue earned from the blueberries sold to the processed market up to a combined total weight of eight thousand five hundred (8,500) pounds per Farmable Acre at a minimum baseline price of $3.50 per pound for the fresh and processed market shall be included in the Crop Proceeds calculation. Tenant shall, from time to time at Landlord's request, make available to Landlord for review all books, records, and other financial or other information that Landlord might reasonably request in connection with determining the Crop Proceeds and Crop Proceeds Rent for any calendar year. For purposes of calculating the Crop Proceeds Rent, upon the development of the Additional Blueberry Acres and Additional Farmable Acres, such Additional Blueberry Acres and Additional Farmable Acres shall be considered Farmable Acres.

(c)  <u>Letters of Credit</u>.

(i)  On the Commencement Date, Tenant shall deliver to Landlord an unconditional, irrevocable, standby, letter of credit for a term through September 15, 2022, in a form attached hereto as **<u>Exhibit E</u>** and incorporated herein by reference, in an amount equal to $1,224,000.00 (the "**LOC 1**"), which amount is equal to the amount of Base Rent payable for calendar year 2022.

(ii)  On or before August 1, 2022 and August 1st of each subsequent calendar year during the Term, Tenant shall deliver to Landlord an unconditional, irrevocable, standby, letter of credit for a term commencing on August 1 of the then-current year and ending September 15 of the following year in the form of **<u>Exhibit E</u>** or such other form reasonably acceptable to Landlord in an amount equal to the Base

Rent for the immediately subsequent calendar year and the estimate of the Crop Proceeds Rent for the then-current calendar year (each, an "**Additional LOC**"). For purposes of each Additional LOC, the "estimate of the Crop Proceeds Rent" shall be the "Crop Proceeds Rent" amount for the applicable year set forth on **Exhibit B** attached hereto.

(d)    Capital Expenditure Assessment. In addition to the payment of Base Rent and Crop Proceeds Rent, during the Term, Tenant shall also pay as Rent, all Expansionary Capital Expenditures (defined below) made by Landlord after the Commencement Date in accordance with "Capital Expenditure Assessment Repayment**"** schedule set forth on **Exhibit B** (the "**Capital Expenditure Assessment**").

Provided there is no default under this Lease by Tenant, Landlord covenants and agrees to fund up to $2,500,000 of Expansionary Capital Expenditures. For the purposes of this Lease, "**Expansionary Capital Expenditures**" means actual, out-of-pocket third party expenditures after the Commencement Date that can be capitalized under GAAP in order to develop the Additional Blueberry Acres and the Additional Farmable Acres, in accordance with the Landlord-approved Development Plan (defined below) and Budget (defined below). All improvements made to the Premises funded by the Capital Expenditure Assessment pursuant to this Section 2(d) shall be owned by Landlord.

(e)    Late Charge. A late charge of two percent (2%) per month of the any Base Rent or Crop Proceeds Rent payment due shall be added to any payment of rent received ten (10) or more calendar days after the stated due date.

(f)    Guaranty. Concurrently with the execution and delivery of this Lease, Tenant shall deliver a guaranty executed by Bricklyn Rooks (the "**Guarantor**") in the form attached hereto as **Exhibit F** and incorporated herein by reference (the "**Guaranty**"). The Guaranty shall be maintained in full force and effect during the remainder of the Term.

3.    ADDITIONAL RENT. "**Additional Rent**" means, collectively, all amounts required to be paid under this Lease other than Base Rent, including, but not limited to, Crop Proceeds Rent, Capital Expenditure Assessment, and Costs (as defined below). "**Rent**" means, collectively, Base Rent and Additional Rent. Landlord shall receive the Base Rent, Crop Proceeds Rent and Capital Expenditure Assessment set forth above free and clear and absolutely net of any and all taxes (including real estate taxes), liens, insurance premiums, charges, maintenance costs and expenses of any nature whatsoever in connection with the ownership, maintenance and operation of the Premises, which are the responsibility of Tenant as more particularly set forth herein. Tenant shall pay all taxes, liens, assessments (including irrigation assessments), insurance premiums, charges, maintenance costs and expenses resulting from the activities, sales, use or operations of the Tenant (collectively referred to as "**Costs**") which, in any way, arise or relate to the Premises or improvements thereon or may be contemplated under any provision of this Lease during the term hereof. All the Costs shall constitute Additional Rent, and upon the failure of Tenant to pay any of the Costs, Landlord shall have the same rights and remedies as provided in this Lease, or by law, for the failure of Tenant to pay Rent. In the event Tenant fails to pay or discharge all the Costs which it is obligated to pay or discharge, Landlord may, but shall not be obligated to, pay the same, and, in that event, Tenant shall immediately reimburse Landlord therefore and pay the sum as Additional Rent, together with interest at the highest rate permitted by law, which is currently set at eight percent (8%) per annum.

5

Tenant hereby agrees to indemnify, defend and save Landlord harmless from and against the Costs. In the event Landlord is liable for any sales, use or similar taxes upon the rent, additional rent, Costs or any other amount paid by Tenant to Landlord or on behalf of Landlord, Tenant shall in all events be liable for all such sales or use taxes and shall immediately remit the same to Landlord. Tenant's obligations under this section shall survive the expiration or earlier termination of the Lease or Lease Term.

4.  CONDITION OF PREMISES. **TENANT ACKNOWLEDGES THAT NEITHER LANDLORD NOR ANY AGENT, CONTRACTOR OR EMPLOYEE OF LANDLORD HAS MADE ANY REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO THE PREMISES, SPECIFICALLY INCLUDING, BUT NOT LIMITED TO, ANY REPRESENTATION OR WARRANTY OF SUITABILITY OR FITNESS OF THE PREMISES FOR ANY PARTICULAR PURPOSE. TENANT ACCEPTS THE PREMISES IN AN "AS IS - WHERE IS, WITH ALL FAULTS" CONDITION**.  This Section shall survive the expiration or earlier termination of this Lease.

5.  USE; AGRICULTURAL PURPOSE; FARM OPERATOR.

(a)  Use; Agricultural Purpose. Tenant covenants and agrees that the Premises shall be continuously used and occupied only by Tenant for a bona fide agricultural purpose as contemplated by applicable statute, rule, ordinance or law, and said bona fide agricultural purpose shall include planting, fertilizing and harvesting organic blueberries and other operations incidental to commercial organic farming of blueberries, and for no other purpose. All of the Farmable Acres shall be used for commercial organic farming of blueberries.  From and after such time as the Additional Blueberry Acres are developed, at least five hundred fifty (550) acres of the Premises shall be used for commercial organic farming of blueberries.  The Farmable Acres, Additional Blueberry Acres and Additional Farmable Acres shall only be used for the following crops: blueberries.  Crops grown on the Premises which are not blueberries must be approved in advance in writing by Landlord, which approval may be withheld in Landlord's sole and absolute discretion.  In addition, Tenant, at Tenant's sole cost and expense, shall at all times conduct operations on and maintain the Premises in accordance with the plan for organic farming approved for Tenant and the Premises by the USDA (a copy of which Tenant shall provide to Landlord upon request) (the "**Organic Farming Plan**"). Landlord and Tenant agree that Landlord shall rely upon this Lease in order to apply for and receive agricultural classification of the Premises pursuant to applicable law. Tenant covenants that it will not engage in any unlawful, illegal or offensive use, shall not engage in any use which may constitute a nuisance and shall, at Tenant's sole cost and expense, comply with all federal, state and local laws, rules, regulations and ordinances. Under no circumstances shall Tenant or its employees, invitees or licensees, be allowed to engage in any activities on the Premises other than commercial farming of blueberries and activities incidental and necessary to support such farming. Prohibited uses and activities include, but are not limited to, the following: hunting, fishing, cattle grazing, sod removal or mineral harvesting.

(b)  Farm Operator. Tenant shall enter into a Contract Farming Agreement in the form attached hereto as Exhibit C (the "**Farming Agreement**") with Carolina Berry Group, LLC as the farm operator (the "**Farm Operator**").  The Farming Agreement shall not be amended, modified or terminated without the prior written approval of Landlord, which approval may be given or withheld in Landlord's sole and absolute discretion.  In addition, Landlord shall have approval, in Landlord's sole and absolute discretion, to any removal, replacement or change (either indirectly or

6

directly) in the Farm Operator.

(c)    Development Plan.    Tenant shall operate the Premises and develop the Additional Blueberry Acres and the Additional Farmable Acres in accordance with Exhibit D attached hereto and incorporated herein by reference (the "**Development Plan**"), pursuant to detailed plans and specifications prepared by Tenant and approved in writing in advance by Landlord, and in accordance with all applicable federal, state and local laws, rules and regulations. Any changes to the Development Plan, including, but not limited to, the budget (the "**Budget**") set forth in the Development Plan, shall be approved in advance in writing by Landlord, which approval may be withheld in Landlord's sole and absolute discretion. On an annual basis, Tenant shall provide the Development Plan and any proposed updates to Landlord. The Development Plan shall be reviewed and approved each year by Landlord and an agronomist designated by Landlord.

6.    FENCING, LOCKS.

(a)    Tenant, at its sole cost and expense, shall keep in good order, condition and repair all fences and gates, if any. All fences, whether presently existing or constructed in the future, are deemed owned by Landlord and shall remain the property of Landlord, as erected, notwithstanding the expiration or termination of this Lease.

(b)    Upon execution of this Lease, Tenant shall deliver to Landlord, or Landlord's authorized representative, a duplicate key to all locks and gates, if any, which grant access to the Premises and buildings on the Premises, and Tenant shall have a continuing obligation under this Lease to deliver to Landlord, or its authorized representative, duplicates of any keys for any locks which are replaced or added to the Premises during the term of this Lease. Tenant shall limit distribution of keys to the Premises to its corporate officers, authorized agents, and no others, who need access to the Premises in order to perform agricultural tasks and duties under the terms of this Lease.

(c)    Tenant shall use its best efforts to prevent trespassing upon the Premises. Such efforts shall specifically include, but not be limited to, taking all reasonable and necessary measures to prevent the use of the Premises by operators of motorcycles, off-road vehicles, and/or all-terrain vehicles. Tenant shall use best efforts to keep the Premises posted, enclosed and secured by locked gates and barbed wire fences.

(d)    Tenant shall take all reasonable and necessary steps, at Tenant's sole cost and expense, to prevent insects, rodents, and other pests on the Premises from becoming a nuisance to adjoining landowners.

7.    RIGHTS RESERVED TO LANDLORD. Landlord or its assignee or its authorized representatives has the right to enter in and upon the surface of the Premises to have, use and enjoy so much of the Premises as shall be required to prospect and explore for, develop and produce from the Premises or any part thereof, coal, oil, gas, minerals, wind, solar, carbon or other natural resource. Landlord reserves the sole, exclusive right to harvest timber, hay and shrubbery from the Premises, and to sequester carbon and sell carbon rights, and Landlord may enter into other written agreements allowing third parties, which may include Tenant, to harvest timber, hay and shrubbery from the Premises. In addition, Landlord or its assignee may use as much of the

Premises as shall be reasonably required for roads, buildings, tanks, pipe lines, utilities, fixtures and equipment in connection therewith desired to be placed on the Premises, all of which shall be done as a reserved right and without opposition or hindrance from Tenant, as fully and completely as if this Lease had not been made. At the time of the possession for the above purposes, if the Premises has been prepared for crops, or if a crop is growing thereon, then Tenant shall be reimbursed for any damages resulting to it from the loss of use of the Premises; and the Rent shall be proportionately reduced for any subsequent years remaining under the term of this Lease. If the Premises has not been prepared for a crop, then it shall be subject to occupancy as reserved land under the direction of Landlord or its assignee for its use and occupancy, and, in that event, Tenant shall make no claim for damages against Landlord or its assignees, provided that the Rent shall be proportionately reduced.

8.    REAL PROPERTY TAXES. Without limiting any other provision herein, Tenant shall be responsible for paying all Real Property Taxes, defined below, during the Term of the Lease. As provided herein, the term "**Real Property Taxes**" shall include any form of real estate or ad valorem tax or assessment, general, special, ordinary or extraordinary, and any fees, levies or taxes imposed on the Premises by any authority having the direct or indirect power to tax against any legal or equitable interest of Landlord in the Premises. Tenant shall cooperate with Landlord in Landlord's efforts to apply for and maintain the "greenbelt", present use, deferred or similar applicable tax status of the Premises pursuant to applicable law, and shall not use or occupy the Premises in any manner as to jeopardize such "greenbelt", present use, deferred or similar applicable tax status, if any.

9.    PERSONAL PROPERTY TAXES. Tenant shall pay prior to delinquency all taxes assessed against and levied upon trade fixtures, equipment and all other personal property of Tenant contained on the Premises. Tenant shall use its best efforts to cause said trade fixtures, equipment and all other personal property to be assessed and billed to Tenant separate and apart from the real property of Landlord. Tenant's obligation to pay such personal property taxes shall survive the expiration or termination of this Lease.

10.    INSURANCE.

(a)    Throughout the Term of this Lease, Tenant shall purchase and maintain, at Tenant's sole cost and expense, insurance that will protect Landlord and Tenant from the following claims which may arise out of or result from occurrences in, on or about the Premises, and from occurrences which may arise from any operations thereon or with respect thereto: (i) claims under Workers' Compensation, disability benefit and similar employee benefit acts; (ii) claims for damages because of bodily injury, occupational sickness or disease, or death of Tenant's employees under any applicable employer's liability law; (iii) claims for damages because of bodily injury or death of any person other than Tenant's employees; (iv) claims for damages insured by usual personal injury liability coverage; (v) claims for damages because of injury to or destruction of tangible property, including loss of use therefrom; and (vi) claims for damages because of bodily injury or death of any person or property damage arising out of the ownership, maintenance or use of any motor vehicle. Such insurance should also be purchased that will protect Landlord and Tenant from physical damage to all improvements and all business and personal property of Tenant which are now or hereafter located on the Premises in at least the amounts set forth herein. If Tenant shall fail to obtain said insurance coverage as required herein, Landlord reserves the right to obtain said insurance, in which case Tenant shall reimburse Landlord within thirty (30) days after payment plus interest at the highest rate permitted by law. During the term of this Lease, the following

8

minimum insurance coverage shall be required:

        (i)      Tenant shall maintain general liability insurance on an industry standard Commercial General Liability coverage form (CG 00 01) (CGL) or Farm Liability coverage form with a company, A-rated or better by A.M. Best Company rating, for personal injury, bodily injury and property damage liability. The limits of liability under this insurance shall not be less than One Million ($1,000,000.00) per occurrence with Three Million ($3,000,000.00) general aggregate.

        (ii)      Insurance coverage (including, without limitation, loss of use and business interruption coverage) upon Tenant's business and upon all property of Tenant or personal property of others kept, stored or maintained on the Premises against loss or damage by fire, windstorm or other casualties or causes with limits of not less than One Million and No/100ths Dollars ($1,000,000.00).

        (iii)      Worker's Compensation Insurance and Employers Liability in the statutory amount covering all employees of Tenant employed or performing services at the Premises.

        (iv)      Property and casualty insurance coverage on an industry standard Personal Property coverage form (CP 00 01) or equivalent farm policy form covering direct physical loss or damage perils, also commonly known as Causes of Loss – Special Form perils (CP 10 30) or equivalent, in an amount equal to the full replacement value of the equipment.  In addition, replacement cost and agreed value coverage enhancements shall be provided.

        (v)      Auto Liability insurance written on an industry standard Business Auto Liability coverage form (NC 00 01) or equivalent.  Covered autos shall include owned, non-owned and hired vehicles.

        (b)      The insurance policy or policies shall name Landlord and Manulife Investment Management Timberland and Agriculture Inc, a Delaware corporation ("**MIMTA**") as additional insureds as their respective interests appear and shall include an effective waiver by the carrier of all rights of subrogation against any named insured of the insured's interest in the Premises or any income derived from the Premises and as further provided in <u>Section 12</u> of this Lease and shall provide that insurance proceeds shall be payable for the benefit of the Landlord (or its designees) and Tenant as their respective interest pay appear.  The insurance policies shall also provide that any losses shall be payable, notwithstanding any act or failure to act or negligence of Landlord, Tenant, or any other person, corporation or other business entity and that no cancellation, reduction in amount or material change in coverage shall be made effective until at least thirty 30) days after receipt by Landlord and Tenant of written notice thereof.

        (c)      Such insurance shall specifically insure (by contractual liability endorsement) Tenant's indemnity obligations under this Lease. The insurance policies shall also provide that any losses shall be payable, notwithstanding any act or failure to act or negligence of Landlord, Tenant, or any other person, corporation or other business entity and that no cancellation, reduction in amount or material change in coverage shall be made effective until at least thirty (30) days after receipt by Landlord and Tenant of written notice thereof. All of Tenant's insurance policies,

regardless of whether they are required specifically hereunder or not, shall by appropriate language exclude any claim on the part of the insurer to be subrogated on payment of loss or otherwise to any claim against Landlord. All policies shall be executed with carriers with A.M. Best rating of B+ or higher. Documentation of all coverages, including additional insured certificates and endorsements, shall be provided to Landlord by Tenant fifteen (15) days prior to the Effective Date.  Acceptance by Landlord of deficient evidence of insurance does not constitute a waiver of contract requirements as provided by the conditions of this Lease.

(d)      All policies of insurance shall be written by reputable and financially sound companies reasonably satisfactory to Landlord and licensed in the State of North Carolina. Certificates of insurance, in form and substance reasonably satisfactory to Landlord.  Renewal certificates of insurance shall be delivered to Landlord not less than twenty (20) days prior to the expiration of the then current insurance policy term.

(e)      Throughout the Term of this Lease, Tenant shall also obtain and maintain, at Tenant's sole cost and expense, a key man life insurance policy in the name of Bricklyn Rooks in the amount of $2,000,000, the beneficiary of which shall be the Landlord, and the form of such life insurance policy shall be reasonably acceptable to Landlord.  It is expressly acknowledged and agreed by the parties that Bricklyn Rooks shall have no interest in such insurance, but Tenant shall cause Bricklyn Rooks to submit to such medical examinations, supply such information and execute such documents as may be required in connection with, or so as to enable the Tenant to effect, such insurance.

(f)      Tenant may, at its sole option and expense, obtain any other insurance on the Premises or any improvements thereon in order assure that Tenant can comply with its obligations under this Lease.

11.    <u>CROP INSURANCE</u>.  Tenant shall purchase and maintain crop insurance covering the crops grown on the Premises in a coverage amount that is not less than seventy percent (70%) of the average value of the crop yield for the Premises for the immediately preceding four (4) calendar years. Landlord shall be entitled to copies of any and all such policies and any and all communications with respect to the same. In the event that Tenant makes a claim on any such insurance policy (or an event arises in which creates or could give rise to a claim under any such policy), Tenant shall notify Landlord in writing promptly and shall keep Landlord fully informed (including without limitation providing Landlord with any and all documentation related to the same) in connection with any such claim or event. In the event any crop insurance claim is paid, the crop insurance awards ("**Crop Insurance Proceeds**") shall be paid directly to the insured and such Crop Insurance Proceeds shall be included in determining the Crop Proceeds.

12.    <u>WAIVER OF SUBROGATION.</u> Tenant shall cause to be inserted in the policy or policies of insurance required in <u>Section 10</u> of this Lease a "waiver of subrogation clause" as to Landlord and MIMTA. Tenant hereby waives, releases and discharges Landlord, its agents and employees, from all claims whatsoever arising out of loss, claim, expense or damage to or destruction covered or coverable by insurance required under this Lease, and, in the event of such loss, Tenant agrees to look to the above described insurance coverage only.

13.    <u>TAXES AND UTILITIES</u>. Tenant shall pay all charges for property taxes, including taxes attributable to any change in ownership, water steam, lights, fuel, gas, heat, electricity, power,

drainage, pumpage and all other utilities and services furnished to Tenant in connection with the use and occupancy of the Premises, including any utility tax that may be levied on electrical power or water use assessment or any charge or assessment that may be made by Bladen County (whether such assessment is included in the tax bill or not), utilities furnished to the Premises together with any taxes thereon.

14.     <u>WATER.</u> Tenant acknowledges and agrees that it shall be solely responsible and liable for the acquisition of all water which may be required by Tenant and to obtain any and all water necessary for irrigation and the conduct of its business operations on the Premises at its sole cost and expense including, but not limited to, all expenses related to all county or mutual water district fees, charges, assessments, levies, and other costs. In the event Tenant purchases water from a water agency or any other party, Tenant hereby agrees to pay such water bills directly and Tenant shall indemnify, defend and hold Landlord, and the Premises, harmless from any and all obligations for the payment of such billings. At all times during the Term of this Lease, Tenant shall take all reasonable steps, and pursue all reasonable measures, to conserve and not overdraft any and all water supplies available to the Premises. Tenant specifically covenants not to waste any water used in or in connection with Tenant's business. Tenant specifically covenants not to utilize water drawn or received at the Premises for any other property or purpose other than agricultural use on the Premises. Tenant specifically covenants to compensate adjoining land-owners to the Premises for adverse effects to adjoining land-owners well water supply resulting from Tenant's use or misuse of well water on the Premises. Tenant, at Tenant's sole cost and expense, shall be responsible for compliance with any applicable laws or regulations or requirements of or promulgated by any local or regional water control board (or similar body) and shall pay all applicable costs or fees and timely submit any reports or studies required or levied thereby respecting the Premises. Without limiting any provision herein, Tenant at its sole cost and expense shall comply with all federal, state and local laws, rules and regulations regulating the application of fertilizers, pesticides or other agricultural products and the discharge of water from the Premises.

15.     <u>MAINTENANCE AND REPAIRS.</u>

(a)     Except as otherwise expressly provided in this Lease, Tenant, at its sole cost and expense, shall promptly make all repairs and maintain the Premises, including, without limitation, the Facility, the pastures, fences, gates, drainage systems, pivots, irrigation systems or equipment, pests, ditch crossings, pipes, outfall structures, buildings and any other improvements on the Premises in the same order and condition in which they exist as of the Commencement Date, ordinary wear and tear excepted, and in accordance with recommendations from Landlord's agronomist. When used in this Section 15, the term "**repairs**" shall include, but not be limited to, replacement, restoration and/or renewals when necessary but shall not include the replacement, restoration or renewal of the blueberry or other crops as may be in existence and cultivated during the term of this Lease outside of said plant's usual and customary lifespan. Tenant's maintenance obligation shall include, but not be limited to, all of the following, to be performed in a manner consistent with good agricultural practices and in accordance with all applicable laws, permits and regulations and the Organic Farming Plan: maintaining organic certification under United States Department of Agriculture National Organic Standards (the "**Organic Standards**") from Quality Certification Services or another certifier authorized by the USDA to certify farms for the production and processing of blueberries at the Premises (the "**Organic Certifications**"); maintaining fences, gates and pastures; applying winterizing and fertilization in accordance with the Organic Standards and Organic Certifications; controlling and treating exotic, noxious, and invasive vegetation, both

11

native and non-native; using water wells; and any legal or consulting expenses necessary to maintain the operations of the Premises.  Tenant's obligation to maintain the drainage systems shall include, but not be limited to, cleaning out ditches and slews and all cleaning and cutting necessary to maintain the same degree of water flow as exists as of the Commencement Date and in a manner consistent with good agricultural practices.  No substitution, alteration of, or addition to the Premises or improvements located thereon may be made without the express, prior written consent of Landlord, except as provided in Section 16 hereof.

(b)    Notwithstanding any provision of this Lease to the contrary, in the event Tenant, an invitee of Tenant, a subtenant or an invitee of a subtenant causes damage to the Premises, Tenant shall be responsible for repair, replacement, restoration and/or renewal of the Premises to the condition it existed prior to such damage, even if such repair is capital in nature.

(c)    Tenant shall permit Landlord and the authorized representatives of Landlord to enter the Premises at all reasonable times during usual business hours for the purpose of exhibiting or inspecting the same and of making any necessary repairs to the Premises and performing any work therein that may be necessary to comply with any laws, ordinances, rules, regulations or requirements of any public authority, or that may be necessary to prevent waste or deterioration in connection with the Premises, which Tenant is obligated, but has failed, to make, perform, or prevent, as the case may be. Nothing in this Lease shall imply any duty upon the part of Landlord to do any such work or to make any alterations, repairs, additions or improvements to the Premises, of any kind whatsoever. The performance thereof by Landlord shall not constitute a waiver of Tenant's default in failing to perform the same. Landlord shall not in any event (except for events caused by Landlord's default hereunder) be liable for inconvenience, annoyance, disturbance, loss of business or other damage of Tenant or any other occupant of the Premises or part thereof, by reason of making repairs or the performance of any work on the Premises or on account of bringing materials, supplies and equipment into or through the Premises during the course thereof and the obligations of Tenant under this Lease shall not thereby be affected in any manner whatsoever.

16.    ALTERATIONS. Tenant shall not make any alterations at the Premises which cost, in the aggregate, more than $25,000.00 in any calendar year or which are Capital Improvements (defined below), without the prior written consent of Landlord in its discretion; provided, however, the provisions of this Section shall not apply to alterations made in accordance with the Landlord-approved Development Plan. In the event that Landlord approves any Capital Improvements at the Premises, Tenant shall provide Landlord with evidence of the costs incurred by Tenant in connection with the same, including without limitation invoices for services and materials. "**Capital Improvements**" shall mean improvements to the Premises which either result in a new structure, prolong or extend the remaining useful life of any existing asset, improvement or item of property located on the Premises beyond a period of one (1) year, increase the size or production capacity of any existing asset, improvement or item of property located on the Premises, or improve the efficiency or safety of any existing asset, improvement or item of property located on the Premises. Costs for maintenance of equipment or other assets that are typical and customary in the normal course of Tenant's business operations to the Premises or which are normally disposed of within one (1) year shall not be considered Capital Improvements for the purposes of this Lease.  In addition, and without limiting the foregoing:

(a)    Tenant shall make no alterations to the Premises which might

12

decrease the value of the Premises or compromise the integrity of any structures.

(b)    Tenant shall take no actions which might in any way give rise to the right to file any liens against Landlord's interest in the Premises, provided that Tenant shall not be prohibited from making alterations otherwise permitted by this section so long as Tenant complies with the provisions of <u>Section 17</u> below;

(c)    Any permissible alterations, including without limitation Capital Improvements, shall be done subject to, and in accordance with, all applicable laws, rules, regulations, and other requirements of all governmental authorities having jurisdiction thereof.

(d)    Tenant shall promptly pay and discharge all costs, expenses, damages, increased taxes, insurance and other liabilities which may arise in connection with or by reason of any alterations, including without limitation Capital Improvements. Any and all alterations, including without limitation, Capital Improvements, shall immediately be and become part of the realty and the sole and absolute property of Landlord and shall remain upon and be surrendered with the Premises at the expiration or other termination of this Lease. Notwithstanding the foregoing, Landlord may request that any alterations be removed and the Premises returned to its original condition at any time during the term of this Lease, and Tenant shall promptly comply with such request.

17.    <u>LIENS</u>. Tenant shall not suffer or permit any liens to stand against the Premises or any part thereof by reason of any work, labor, services or materials done for, or supplied, or claimed to have been done for, or supplied to, Tenant or anyone holding the Premises or any part thereof through or under Tenant. If any such lien shall at any time be filed against the Premises, Tenant shall cause the same to be discharged of record within thirty (30) days after the date of filing the same, by payment, deposit or bond. If Tenant shall fail to discharge any such lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, procure the discharge of the same either by paying amount claimed to be due by deposit in court or bonding. Any amount paid or deposited by Landlord for any of the aforesaid purposes, and all legal and other expenses of Landlord, including, without limitation, counsel fees, in defending any such action or in or about procuring the discharge of such lien, with all necessary disbursements in connection therewith, together with interest thereon at the highest rate permitted by law from the date of payment or deposit, shall become due and payable forthwith by Tenant to Landlord, or, at the option of Landlord, shall be payable by Tenant to Landlord as additional rent. Tenant shall indemnify and defend Landlord against and save Landlord and the Premises harmless from all losses, costs, damages, expenses, liabilities, suits, penalties, claims, demands and obligations, including without limitation, reasonable attorneys' fees, resulting from the assertion, filing, foreclosure or other legal proceedings with respect to any lien. Tenant's obligation of indemnity hereunder shall survive the termination or expiration of this Lease.

18.    <u>HAZARDOUS MATERIAL</u>. Tenant shall not bring any Hazardous Materials (defined below), onto the Premises and Tenant shall, at all times and in all respects comply with all Environmental Laws (defined below). Upon expiration or termination of this Lease, Tenant shall cause all Hazardous Materials for which it is responsible to be removed from the Premises and transported and disposed of in compliance with all Environmental Laws. Tenant shall notify Landlord immediately of any violation of Environmental Laws or a Release (defined below)

13

affecting the Premises.  In the event that Tenant must take remedial action in order to respond to a Release or to the presence of Hazardous Materials which are an imminent threat to human health or the Premises, or both, Tenant shall immediately notify Landlord. Tenant shall not enter into any settlement agreement, consent, decree or other compromise with respect to any remedial action without first notifying Landlord of Tenant's intention to do so and affording Landlord ample opportunity to appear, intervene or otherwise appropriately assert and protect Landlord's interest. Tenant shall defend, indemnify and hold Landlord harmless from and against any and all liabilities, damages, costs or expenses whatsoever (including, but not limited to, all reasonable attorneys' fees) resulting from or relating to Tenant's generation, use, storage, disposal or transportation of any Hazardous Materials upon the Premises or a Release caused by Tenant, its agents, employees, invitees or contractors during the term of this Lease, and any renewals hereof. Notwithstanding anything herein to the contrary, in the event Landlord has cause to believe that the placement or disposal of Hazardous Materials has occurred on the Premises during the term of this Lease, then Landlord shall have the right to engage appropriate agents and representatives to conduct an "environmental audit" of the Premises. If Tenant is the cause of such placement or disposal, then Tenant shall reimburse Landlord for the cost of the environmental audit. Tenant's obligation of defense and indemnity hereunder shall survive the termination or expiration of this Lease.

"**Environmental Law**" means any present, future, federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, including without limitation, the following statutes, and any successor thereto, regulations promulgated pursuant thereto: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Endangered Species Act; the National Environmental Policy Act; and the Federal Insecticide, Fungicide and Rodenticide Act.

"**Hazardous Materials**" includes but is not limited to any and all substances (whether solid, liquid or gas) defined, listed or otherwise classified as pollutants, hazardous substances, hazardous materials, hazardous materials, wastes, or words of similar meaning or regulatory effect under any Environmental Laws or that may have a negative impact on human health or the environment.

"**Release**" means any release, deposit, discharge, emission, leaking, leaching, presence, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

For purposes of this Lease, the term Hazardous Materials includes chemicals, herbicides, fertilizers, pesticides, manure, petroleum products, fuels or lubricants customarily used in farming practices in the County where the Premises is situated ("**Farm Use Materials**"), but Tenant's obligations with respect to Hazardous Materials are deemed qualified by the following: Landlord and Tenant recognize and acknowledge that Farm Use Materials will be used and applied on the Premises, but only in full compliance with Environmental Law and the Organic Standards.

19.    <u>NO WASTE</u>. Tenant shall commit no waste on the Premises, dig no pits or lakes on the Premises, remove no soil, timber or minerals from the Premises or store or leave any trash or any waste material on the Premises. Tenant hereby agrees that it shall keep the pastures in good condition and in a manner consistent with good organic agricultural practices. Tenant shall

properly fertilize any improved pastures according to the Organic Standards, the Organic Farming Plan, all applicable laws and regulations and accepted agricultural practices usually employed for organic commercial farming for blueberry crops in the State of North Carolina and in a manner consistent with good organic agricultural practices. Tenant shall supervise the Premises at all times and shall exercise every reasonable best effort to prevent theft, vandalism and other damage to the Premises.  Tenant's responsibility hereunder shall also include, but not be limited to, the policing of the property to prevent the unlawful entry of trespassers, poaching and the dumping of trash or garbage on the Premises.

20.    <u>DEFAULT</u>.    The occurrence of any one or more of the following events ("**Events of Default**") shall constitute a default and breach of this Lease by Tenant:

(a)    The vacating or abandonment of the Premises by Tenant; or

(b)    The failure by Tenant to make any payment of Rent or any other payment required to be made by Tenant hereunder, as and when due, or any failure to timely deliver any Additional LOC as and when due under the Lease; or

(c)    The default by Guarantor of any terms and conditions under the Guaranty; or

(d)    The failure by Tenant to conduct its organic commercial farming operations in such a manner as to have the Premises qualify for "greenbelt" or present use tax status or similar applicable tax assessment for agricultural use pursuant to applicable law or the failure by Tenant to maintain the Organic Certifications; or

(e)    The failure by Tenant to observe or perform any of the other covenants, conditions or provisions of this Lease where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant materially commits to such cure within said thirty (30) day period and thereafter diligently pursues such cure to completion within sixty (60) days after the date of Landlord's original written default notice; or

(f)    Entry by Tenant into any contract or bargaining obligation with a union, labor organization or collective group of employees in a way that will (1) prevent the Base Rent, Crop Proceeds Rent, or Additional Rent from being paid to Landlord in full when due, or (2) tie the Premises to any such agreement (in each case, a "**Labor Agreement**"); or

(g)    A "Voluntary Bankruptcy" or an "Involuntary Bankruptcy" of Tenant. A "**Voluntary Bankruptcy**" means, with respect to any person, the inability of such person generally to pay its debts as such become due, or an admission in writing by such person of its inability to pay its debts generally or a general assignment by such person for the benefit of a creditor; the filing of any petition or answer by such person seeking to adjudicate it as bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or appointment of a receiver, trustee, or other similar official for such person or for any substantial part of its property; or corporate action taken by such person to authorize any of the actions set forth above. An "**Involuntary Bankruptcy**" means, with respect

15

to any person, without the consent or acquiescence of such person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such person which petition shall not be dismissed within sixty (60) days, or, without the consent or acquiescence of such person, the entering of any order appointing a trustee, custodian, receiver or liquidator of such person or of all or any substantial part of the property of such person which order shall not be dismissed within thirty (30) days.

21.     <u>REMEDIES</u>.

(a)     In the event of any default or breach by Tenant, Landlord may, at any time thereafter, with or without notice or demand and without limiting Landlord in the exercise of any right or remedy which Landlord may have by reason of such default or breach:

(i)     continue this Lease in full force and effect and recover rent and other amounts as it becomes due;

(ii)     terminate the Term of the Lease by written notice to Tenant, effective as of the date specified in such notice, with the estate vested in Tenant and all other rights of Tenant hereunder ceasing on such date;

(iii)     with or without terminating the Term, reenter and repossess the Premises or any part thereof, including all crops, by summary proceeding, ejection or otherwise, and remove or cause the removal of Tenant and all other persons and any and all property therefrom, in such manner as Landlord may deem advisable, with or without legal process, and using such reasonable force as may be necessary and as permitted by law;

(iv)     at any time or from time to time after the repossession of the Premises or any part thereof, whether or not the Term shall have been terminated, relet the Premises or any part thereof for the account of Tenant, in the name of Tenant or Landlord or otherwise, without notice to Tenant, for the remainder of the Term and on the conditions and for the uses as Landlord in its absolute discretion, may determine and may collect and receive the rents therefor; provided, Landlord shall not be responsible or liable for any failure to so relet or to collect any rent due upon such reletting and in the event of re-entry without terminating the Term, Tenant shall continue to be liable for all rents and other charges accruing or coming due under this Lease which shall automatically accelerate and become immediately due and payable;

(b)     In the event of any Event of Default, Tenant releases all claim to and agrees that Landlord may, at its option, take possession of and cultivate, harvest, and/or sell crops grown on the Premises, applying the net proceeds to Landlord's damages.  Tenant shall reimburse Landlord for all other costs and expenses incurred by or on behalf of Landlord (including, without limitation, attorneys' fees and expenses and expenses to cultivate, harvest, and/or sell crops on the Premises) occasioned by any default by Tenant under this Lease.

(c)     No expiration or termination of this Lease or the term thereof pursuant to Section 21 or by operation of law, or otherwise, and no repossession of the Premises or any part thereof pursuant to Section 21, or otherwise, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive the expiration, termination or repossession.  In the event of any expiration, termination or repossession, Tenant shall pay to Landlord all Rent and other sums required to be paid by Tenant up to the time of the expiration, termination or repossession; and thereafter Tenant (until the end of what would have been the full term of this Lease in the absence of the expiration, termination or repossession and whether or not the Premises or any part thereof shall have been relet) shall be liable to Landlord for and shall pay to Landlord as liquidated and agreed current damages for Tenant's default all Rent and other sums which would be payable under this Lease by Tenant in the absence of the expiration, termination or repossession LESS all net rents collected by Landlord from any reletting effected for the account of the Tenant pursuant to this paragraph, after deducting from the proceeds all of Landlord's expenses in connection with the reletting (including, without limitation, all repossession costs, brokerage commissions, legal and accounting expenses, attorney's fees and expenses, employees' expenses, promotional expenses, and expenses of preparation for the reletting). Tenant shall pay current damages annually on the Rent payment dates applicable in the absence of the expiration, termination or repossession, and Landlord shall be entitled to recover the same from Tenant on each applicable date. In addition, Tenant shall reimburse Landlord for all costs and expense incurred by or on behalf of Landlord (including, without limitation, reasonable attorneys' fees and expenses) occasioned by any default or breach by Tenant under this Lease.

(d)     In the event Tenant shall fail to make any payment or perform any act required hereunder to be made or performed by Tenant, then Landlord may, but shall be under no obligation to, following any applicable notice and cure period, make a payment or perform an act with the same effect as if made or performed by Tenant.  Entry by Landlord on the Premises for the above purpose shall not waive or release Tenant from any obligation or default hereunder.  Tenant shall reimburse, with interest at the rate specified in Section 3 above, Landlord for all sums so paid by Landlord and all costs and expenses incurred by Landlord in connection with the performance of any act which Tenant fails to perform as required by this Lease.

(e)     In the event of any Event of Default, Landlord will use commercially reasonable efforts to mitigate damages.

22.     <u>REMEDIES CUMULATIVE</u>. The various rights, options, elections, powers and remedies contained in this Lease shall be construed as cumulative and no one of them shall be exclusive of any of the others, or of any other legal and equitable remedy which either party may otherwise have in the event of breach or default in the terms of this Lease, and the exercise of one right or remedy by such party shall not impair its rights to any other right or remedy until all obligations imposed upon any other party have been fully performed. Tenant hereby waives any statutory notice of default. The provisions of this Section 22 shall survive the expiration or termination of this Lease.

23.     <u>WAIVERS</u>. No re-entry or taking possession of the Premises by Landlord upon default shall be construed as an election on its part to terminate this Lease unless a written notice of such intention be given to Tenant, nor shall termination of this Lease by Landlord and pursuit of any remedy herein provided constitute a forfeiture or waiver of any rent due to Landlord hereunder

17

or of any damages accruing to Landlord by reason of the violation of any terms, provisions and covenants herein contained. Landlord's acceptance of rent following any event of default hereunder shall not be construed as Landlord's waiver of such event of default. No forbearance by Landlord of action upon any violation or breach of any terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default, including, without limitation, any notices required pursuant to applicable law.

24.    SUBORDINATION; ESTOPPEL. Tenant agrees and acknowledges that all of Tenant's right, title and interest under this Lease is automatically subordinate to the lien of any existing or future lender without any further act by Tenant. However, in order to manifest and confirm the foregoing, Tenant shall subordinate its leasehold interest in the Premises to the mortgage lien of any financing Landlord may wish to obtain at any time during the Lease Term. Tenant shall also, upon request by Landlord, its lender or by any prospective purchaser of the Premises or its lender, provide a tenant estoppel in the form reasonably requested by Landlord, such purchaser or lender(s). The failure of Tenant to so deliver any such instrument or instruments within ten (10) days after demand in writing by Landlord shall constitute a default hereunder, and Landlord shall be entitled to all of its remedies. Furthermore, Tenant hereby appoints Landlord as Tenant's attorney-in-fact to execute such instruments of subordination in the event Tenant fails to execute such instruments within ten (10) days after demand.

25.    INDEMNITY. Except as caused by the grossly negligent or intentional acts or omissions of Landlord or its employees, agents, contractors, lessees or invitees, Tenant shall defend, indemnify and hold harmless Landlord, its members, managers, agents and employees from and against any and all claims, actions, liabilities, losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees) (collectively, "Claims") arising or resulting from (a) Tenant's use, operation and occupation of the Premises, including all Claims related to Tenant's employees, agents, contractors, lessees, or invitees; (b) injury to person or property from whatever cause while in, on or near the Premises; (c) any labor or materials performed on or provided to the Premises at the request of or for the benefit of Tenant, its agents or employees; or (d) Tenant's failure to perform any provision of this Lease or to comply with any applicable laws, Environmental Laws, or as imposed by any duly authorized governmental agency or political subdivision (provided that Landlord shall be reasonable to comply with any requirements necessitating structural or permanent improvements or changes to the Premises which are not caused by the negligent or willful acts or omissions of Tenant). If any claim, action or proceeding is brought against Landlord, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel satisfactory to Landlord. Tenant, as a material part of the consideration to Landlord, hereby assumes all risk of damage to property or injury to any persons, in, upon or about the Premises arising from any cause, and Tenant hereby waives all claims in respect thereof against Landlord. Tenant's obligations of indemnity hereunder shall expressly survive the termination or expiration of this Lease. Notwithstanding the foregoing, this paragraph shall not be construed to waive any liability of the Landlord or its employees and agents from damages to the extent due to the gross negligence or intentional acts of the Landlord or its employees and agents.

26.    EXCULPATION OF LANDLORD.    Notwithstanding anything to the contrary that may be provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration of the execution of this Lease by Landlord, that there shall be absolutely

18

no personal liability on the part of Landlord, its successors, assigns or any mortgagee in possession (for the purposes of this paragraph, collectively referred to "Landlord"), with respect to any of the terms, covenants and conditions of this Lease, and Tenant shall look solely to the equity of Landlord in the Premises for the satisfaction of each and every remedy of Tenant in the event of any breach by Landlord of any of the terms, covenants and conditions of this Lease to be performed by Landlord, such exculpation of liability to be absolute and without any exceptions whatsoever.

27.   <u>CONDEMNATION</u>. If the Premises or any portion thereof is taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "**condemnation**"), this Lease shall terminate only as to the Premises so taken as of the date the condemning authority takes title or possession, whichever occurs first. In the event that any portion of Farmable Acres are taken by such condemnation, Landlord shall, within thirty (30) days after the latter of the date that the condemning authority takes title or possession or Landlord's receipt of the applicable condemnation award or condemnation, refund to Tenant a prorata amount equal to the remaining balance of prepaid Base Rent, if any, fairly allocable to the Farmable Acres taken in such condemnation action and any future payment of minimum rent shall be adjusted accordingly. Notwithstanding the foregoing, in no event shall Landlord be obligated to refund Tenant any amount in excess of any condemnation award or compensation received by Landlord. However, this termination shall not relieve Tenant of their indemnity obligations hereunder. Subject to Landlord's obligations to refund prepaid Base Rent pursuant to this section, any award for the taking of all or any part of the Premises under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord. Landlord shall, to the extent of severance damages received by Landlord in connection with such condemnation, repair any damage to the Premises caused by such condemnation, except to the extent that Tenant has been reimbursed therefore by the condemning authority. Tenant shall pay any amount in excess of such severance damages required to complete such repair.

28.   <u>NOTICES, PAYMENT</u>. Notices provided for in this Lease shall be (i) delivered personally, (ii) sent by registered or certified mail, postage prepaid, return receipt requested, (iii) sent via a reputable express courier, (iv) sent by confirmed facsimile during normal business hours with a confirmation copy delivered via reputable express courier, addressed as set forth above, or (v) sent by electronic mail during normal business hours with a confirmation copy delivered via reputable express courier, addressed as set forth above. Notice sent by U.S. mail is deemed delivered when received by the applicable party. Notice sent by a reputable express carrier is deemed received on the day receipted for by the express carrier or its agent. Notice sent via facsimile is deemed delivered upon the confirmed transmission to the phone number designated as the recipient's facsimile phone number above. Notice sent via electronic mail is deemed delivered upon the entrance of such electronic mail into the information processing system designated by the recipient's electronic mail address set forth above. All notices, payments, demands and requests shall be addressed as follows, provided that any party shall have the right from time to time to change the address to which notices to it shall be sent to another address, and to specify two additional addresses to which copies of notices to it shall be mailed, by giving to the other party at least ten (10) days prior notice of the changed address or additional addresses:

To Landlord:          Brown Pelican Farms LLC
                      c/o Manulife Investment

Management Agriculture
197 Clarendon Street
C-08-99
Boston, MA 02116-5010
Attn: Managing Director
      Manulife Investment Management Agriculture

With copy to:      Manulife Investment Management Agriculture Services Inc
1803 Woodfield Drive Suite B
Savoy, IL, 61874

With copy to:      Womble Bond Dickinson (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Attn: Trent Jernigan

To Tenant:      c/o Brick Rooks
63 Hemlock Drive
Whiteville, NC 28472

With copy to:      Carofin
100 Elks Club Road
Brevard, NC 28712

29.    <u>BROKERS</u>. Landlord and Tenant warrant each and to the other that they have not contracted with any broker or real estate salesperson in connection with this transaction nor are they responsible for any brokerage fees, commissions or finder's fees arising out of this Lease. Landlord and Tenant shall each hold the other party harmless of and from any and all real estate brokers' or salesperson's commissions or finders' fees in connection with this transaction which are determined to be due from said indemnifying party by a court of competent and final jurisdiction.

30.    <u>ASSIGNMENT AND SUBLETTING</u>.

(a)    Tenant shall not voluntarily or by operation of law assign, transfer, mortgage, sublet, or otherwise transfer or encumber all or any part of Tenant's interest in this Lease or in the Premises, without Landlord's prior written consent, which consent shall not be unreasonably withheld. Any attempt at assignment, transfer, mortgage, encumbrance or subletting without such consent shall be null and void <u>ab initio</u> and shall constitute a breach of this Lease. The consent by Landlord to any assignment or sublease shall not constitute a waiver of the necessity for such consent to any subsequent assignment or sublease. No assignment, transfer or subletting shall in any way release Tenant from its obligations hereunder. Landlord reserves the right to assign all or any part of its interest in this Lease, and shall thereupon be released of all duties and obligations under this Lease. Notwithstanding the foregoing, the Farm Operator must be approved in advance, which approval may be withheld in Landlord's sole and absolute discretion.

(b)    Notwithstanding the foregoing Section 30(a), Tenant shall have the right to sublease or license non-tillable portions of the Premises to its farm employees or laborers who are

actively engaged to work on the Premises pursuant to a separate agreement for the limited purpose of parking a trailer, RV or camper on the Premises provided that (i) upon the expiration or earlier termination of this Lease, Tenant shall, at its sole cost and expense, remove any such trailer, RV or camper from the Premises, and (ii) notwithstanding the terms of any such sublease or license, Tenant shall, at Tenant's sole cost and expense, ensure that any trailer, RV or camper on the Premises is and remains in good, clean, safe and sanitary condition and repair, and (iii) if any trailer, RV or camper ceases to be utilized by such farm employee or laborer at any time during the Term, Tenant shall, at Tenant's sole cost and expense, promptly remove same from the Premises.  Tenant shall defend, indemnify and hold Landlord harmless from and against any and all liabilities, damages, costs or expenses whatsoever (including, but not limited to, all reasonable attorneys' fees) resulting from or relating to any such trailer, RV or camper on the Premises.  Tenant's obligation of indemnity hereunder shall survive the termination or expiration of this Lease.

31.    SURRENDER OF PREMISES. Tenant shall, upon the expiration or termination of this Lease for any reason whatsoever, surrender to Landlord the Premises, including, without limitation, the pastures, fences, gates, buildings, structures and equipment then upon the Premises, together with all alterations and replacements thereof then on the Premises, in substantially the same order, condition and repair, that the Premises are in as of the Commencement Date, except for reasonable and ordinary wear and tear. (Wherever the term "**reasonable and ordinary wear and tear**" is used in this Lease, it should be understood to contemplate that Tenant will have performed a reasonable maintenance program during the Term hereof.) At the expiration of termination of this Lease for any reason whatsoever, Landlord shall have the right to inspect the Premises in order to determine, in Landlord's reasonable discretion, that all portions of the Premises are in such good condition, ordinary wear and tear excepted. Any repairs deemed necessary in the reasonable opinion of Landlord shall be paid for by Tenant. Title to all of Tenant's trade fixtures, furniture and equipment installed in the Premises shall remain in Tenant, and upon expiration or other termination of this Lease, the same may and, upon the demand of Landlord, shall be removed and any resultant damage to the Premises shall be repaired, by and at the expense of Tenant; provided, however, that if, upon any such expiration or other termination of this Lease, Tenant shall be delinquent or in default under any of the provisions hereof, Tenant shall not, without Landlord's prior written consent, be entitled to remove any such trade fixtures, furniture or equipment unless and until such delinquency or default shall have been cured, and if such delinquency or default shall not have been cured by Tenant within thirty (30) days after the date of such expiration or termination, all such trade fixtures, furniture and equipment of Tenant shall, at Landlord's option, be and become the absolute property of Landlord.

32.    HOLDOVER BY TENANT.  In the event that Tenant shall not immediately surrender the Premises on the expiration or earlier termination of the Term, Tenant, at the option of Landlord, shall become a month-to-month tenant at 150% of the Rent in effect during the last year of the Term and subject to all of the terms, conditions, covenants and agreements of this Lease. Notwithstanding the foregoing, in the event that Tenant shall hold over after the expiration of the Term, then Landlord, at its option, may immediately re-enter and take possession of the Premises with or without process, in which case Tenant shall be liable to Landlord for all costs (including without limitation, reasonable attorney's fees), injuries and damages suffered by Landlord as a result of the holdover.

33.    GRANT OF SECURITY INTEREST. Tenant hereby grants to Landlord a security interest ("**Security Interest**") in all crops grown or growing on the Premises, and in all sale proceeds therefrom, in addition to any statutory liens, to secure Tenant's full and faithful performance of its

obligations under this Lease (including, without limitation, Tenant's obligation to pay Rent, Additional Rent and all other sums due under this Lease). Landlord is authorized to file any document or instrument necessary or desirable to perfect or otherwise evidence such security interest. Without limiting the foregoing, Landlord hereby reserves any common law or statutory lien given to a farm landlord for crop rents. fully paid. Tenant hereby grants Landlord a Security Interest for the entire Term in accordance with the previous sentence in: (a) all crops growing on or to be grown on the Premises; (b) all crops harvested by Tenant from the Premises and crops stored on the Premises; (c) all warehouse receipts issued by any warehouse as evidence of the delivery and storage of the Tenant's crops grown on the Premises; (d) general intangibles, accounts, rents, issues and profits; (e) payments or entitlements under contracts or any local, state or federal agricultural programs related to the Premises.

34.    TENANT'S RIGHT TO OBTAIN CROP FINANCING. Although Tenant does not currently anticipate the need to obtain crop financing, Landlord hereby expressly authorizes Tenant to finance the growing and production of any or all crops on the Premises and to execute in Tenant's name security agreements and financing statements covering Tenant's share of the crops and crop insurance proceeds (collectively and singularly referred to as the "Tenant's Crop Share"). In the event that Tenant's financing arrangements require that Landlord subordinate its security interest in Tenant's Crop Share to the security interest of Tenant's lender in and to Tenant's Crop Share, or enter into an intercreditor agreement in a form acceptable to Landlord with such lender, Landlord agrees not to unreasonably withhold its written consent to such subordination or such intercreditor agreement and to use its best efforts to reach an agreement satisfactory to Tenant's lender. Landlord shall have no obligation whatsoever to subordinate its security interest in the crops except to the extent of Tenant's Crop Share. Landlord will not permit there to be a lien on the Premises to secure Tenant's crop financing, and Tenant is not authorized to grant and shall not grant any such interest or lien. Landlord will have no personal liability in connection with Tenant's crop financing. If Landlord reasonably consents to subordinate its security interest in Tenant's Crop Share to the security interest of Tenant's lender in and to Tenant's Crop Share, then Landlord agrees to execute any subordination or other documents or instruments as may be reasonably required to create, evidence, and establish Tenant's lender's priority for such security interest in and to Tenant's Crop Share. Tenant specifically agrees that the proceeds of any such crop financing shall be used by Tenant entirely for production of crops on the Premises.

35.    PRIOR AGREEMENTS.    This Lease contains all conditions, covenants and agreements between Landlord and Tenant relating in any manner to the rental, use and occupancy of the Premises and the other matters set forth in this Lease. No prior or contemporaneous agreements or understanding pertaining to the Premises shall be valid or of any force or effect, and the conditions, covenants and agreements of this Lease cannot be altered, changed, modified, or added to, except in writing signed by Landlord and Tenant. Landlord and Tenant intend that this Lease supersedes all such prior or contemporaneous agreements and that this Lease constitutes the final, exclusive and complete embodiment of their agreement.

36.    AMENDMENTS. This Lease may be modified only by written instrument signed by the parties in interest at the time of the modification and with the same formalities provided herein.

37.    BINDING EFFECT. Each and all of the provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators,

successors and assigns and all of those holding title under any of them, subject at all times, nevertheless, to all agreements and restrictions contained elsewhere in this Lease with respect to the assignments, transfers, encumbering or subletting of all or part of Tenant's interest in this Lease. All covenants, conditions, and agreements contained in this Lease shall be construed as covenants running with the land. The pronouns herein shall include, where appropriate, either gender or both, singular and plural.

38. <u>CAPTIONS; SEVERABILITY</u>. The captions in this Lease are for convenience only. They are not part of this Lease and do not in any way limit or amplify the terms and provisions of this Lease. The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

39. <u>TIME OF ESSENCE</u>. Time is of the essence in this Lease.

40. <u>RELATIONSHIP OF THE PARTIES</u>. Nothing contained in this Lease shall be deemed or construed by the parties or by any third person to create the relationship of principal and agent or of partnership or of joint venture or of any association between Landlord and Tenant, other than the relationship of landlord and tenant.

41. <u>ATTORNEYS' FEES, CHOICE OF LAW, VENUE</u>. In the event of any legal or equitable action, including, without limitation, any appeals or bankruptcy proceedings, which may arise hereunder between or among the parties hereto, the prevailing party in such action, on trial or appeal, shall be entitled to recover its costs, expenses and reasonable attorneys' fees, all of which shall be paid by the losing party. This Lease shall be governed by the laws of the State of North Carolina and venue for any civil action brought hereunder shall lie in Bladen County, North Carolina.

42. <u>RECORDING</u>. This Lease shall not be recorded without the express written approval of Landlord, which approval may be granted or withheld in Landlord's sole discretion. However, Landlord and Tenant may, upon written request from the other party, execute and acknowledge a memorandum or short form lease which may be filed for record by either party at any time after the execution of this Lease, setting forth the parties, description of the Premises, Term, Extended Term, right of first refusal, and any other provisions mutually agreed upon (specifically excluding, however, economic terms).

43. <u>RADON</u>. Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in North Carolina. Additional information regarding radon and radon testing may be obtained from the county public health unit. This Lease is not contingent upon Tenant's approval of any testing it may elect to perform with respect to either radon or energy efficiency.

44. <u>RIGHT OF FIRST OFFER</u>. During the term of this Lease, Tenant shall have a right of first offer to acquire the Premises ("**ROFO**") on the terms set forth herein.

(a) <u>Offer Notice</u>. If Landlord desires to sell, transfer or otherwise convey (collectively "**Transfer**") Landlord's fee interest in and to the Premises to an unaffiliated third-party transferee, and if Tenant is not in default of any material provision of this Lease at that time,

Landlord shall give Tenant written notice ("**Offer Notice**") that Landlord desires to sell the Premises.

(b)    <u>Response Period</u>.    Tenant may by written notice to Landlord given within thirty (30) days after receipt of the Offer Notice (the "**Response Period**") to either: (i) acquire the Premises at the price and on the same terms set forth in the Offer Notice; or (ii) not elect to acquire the Premises.

(c)    <u>Purchase Agreement</u>.    If Tenant elects to acquire the Premises, Landlord and Tenant shall promptly enter into a Purchase and Sale Agreement ("**Purchase Agreement**"), and Landlord shall thereafter sell and Tenant shall purchase the Premises on the terms and subject to the conditions set forth in the Purchase Agreement.

(d)    <u>Failure to Respond</u>.    If Tenant elects not to purchase the Premises or fails to respond within the Response Period, then Landlord may market the Premises for sale to third parties. If Landlord locates another purchase for the Premises, and the new offer is less than ninety percent (90%) of the purchase price set forth in the Offer Notice, and such new offer is acceptable to Landlord, Landlord shall notify Tenant in writing that Tenant may re-submit a bid to purchase the Premises for the price and on the terms offered by the new proposed purchaser.  Tenant shall have a period of five (5) business days following receipt of such notice to re-submit a bid to purchase the Premises on such terms.  If Tenant fails to submit a bid during such five (5) business day period, or if Landlord and Tenant fail to enter into a binding purchase and sale agreement within ten (10) days after the expiration of such five (5) business day period, then Tenant's rights under this Section 44 shall terminate and shall be of no further force or effect, and Landlord shall thereafter have the right to sell the Premises to any part on terms deemed acceptable to Landlord in its sole discretion, and Tenant shall sign all such documentation as may be necessary or desirable to terminate all Tenant's rights under this Section 44.

(e)    <u>Excluded Transfers</u>.    Notwithstanding the foregoing, transfers to Landlord's affiliated entities, mortgages, and transfers in connection with the foreclosure of mortgages or deeds in lieu of foreclosure, shall not be restricted by or subject to the ROFO (an "**Excluded Transfer**"), but the transferee in the Excluded Transfer will be bound by the Lease and subject to the ROFO on any subsequent sale or transfer.

45.    <u>COUNTERPART EXECUTION</u>. This Lease may be executed in any number of counterparts, each of which, when executed and delivered, shall constitute an original and such counterparts together shall constitute one and the same instrument. Signature and acknowledgment pages, if any, may be detached from the counterparts and attached to a single copy of this document to physically form one document. This Lease may be executed and delivered electronically (PDF, DocuSign, etc.), and electronic signatures shall constitute originals.

46.    <u>CONTINGENCY</u>.    The parties acknowledge and agree Landlord has not yet closed its purchase of the Premises (the "**Closing**") under that certain Real Estate Purchase Contract by and between MIMTA, as purchaser, and Homeland Land Holdings LLC, as seller, dated September 15, 2021, as amended (the "**MIMTA Purchase Agreement**"). The date of such Closing shall be the Commencement Date of the Term as provided in Section 1 above. Notwithstanding any provision of this Lease to the contrary, if Landlord elects not to close the purchase of the Premises and to terminate the Purchase Agreement pursuant to the terms thereof,

24

then this Lease shall not commence, and the parties shall have no rights and obligations hereunder.

47.   TENANT'S FINANCIAL STATEMENTS, COVENANTS AND PERFORMANCE REPORTS.

(a)   Monthly Statements. Tenant shall deliver to Landlord, monthly, within thirty (30) days after the end of each calendar month during the Term, (i) its monthly financial statements, including, but not limited to, a balance sheet and profit and loss statement for the most recent prior calendar month, together with calculations showing Tenant's compliance with the Financial Covenants (as defined below); and (ii) monthly settlement statements from third party fruit marketer(s).

(b)   Annual Statements. Tenant shall deliver to Landlord, annually, within three (3) months after the end of Tenant's fiscal year starting in 2022, (i) its current financial statements, including, but not limited to, a balance sheet and profit and loss statement for the most recent prior year, all prepared and compiled by a certified public accountant, together with calculations showing Tenant's compliance with the Financial Covenants; and (ii) annual settlement statements from third party fruit marketer(s).

(c)   Financial Covenants.   Throughout the Term of this Lease, Tenant shall maintain and observe each of the following financial covenants (the "**Financial Covenants**"):

(i)   Tenant will not permit the ratio of its Current Assets to its Current Liabilities, determined on a consolidated basis, to be less than 2.0 to 1.0 as of the last day of any fiscal quarter of Tenant.

(ii)   Tenant will not permit withdrawals or distributions (or loans to members, partners or shareholders) to exceed 25% of Net Income or $500,000, whichever is less.

(iii)   Tenant will not permit the Net Debt to EBITDA Ratio to be greater than 5.0 to 1.0 as of the last day of each fiscal quarter of Tenant.

The Financial Covenants and the capitalized terms used but not otherwise defined in this Section 47(c) shall be interpreted in accordance with the meanings ascribed to such terms under Generally Accepted Accounting Principles ("GAAP"), consistently applied.  In the event Tenant fails to comply with any of the Financial Covenants, such failure shall be an Event of Default.  Following the occurrence of an Event of Default under this Section 47(c), until such time as Tenant delivers evidence to Landlord demonstrating Tenant's compliance with the Financial Covenants, Tenant shall not make any distributions to any of Tenant's stockholders, partners or members.

For purposes of this Section 47, all references to Tenant shall refer to Tenant and all subsidiaries of Tenant.

(d)   Records; Performance Reports.  Tenant shall maintain accurate and complete records of its operations on the Premises and make them available at any time for inspection and examination by Landlord.  Tenant agrees to provide information as requested by Landlord with regard to fertilizer used, tillage practices, acreage reports, chemical usage, crop yields, crop prices, crop grades, farming cost, and crop marketing correspondence, in a timely manner.  Landlord shall have the right to require Tenant to provide Landlord with annual Premises performance reports including crop yields, crop grades, farming cost, crop marketing correspondence, and financial statements.

(e)    Farm Operator Statements.  The Farming Agreement shall contain similar obligations of the Farm Operator to deliver statements in accordance with this Section.

48.    CERTIFICATION.  Tenant certifies that it is not acting, directly or indirectly, for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person" or any other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control, U.S. Secretary of State, or other federal agency; and is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation. Tenant hereby agrees to defend, indemnify and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

49.    AUTHORITY.  Tenant, and the individual signing on behalf of Tenant, represents and warrants to Landlord that it has full capacity, right, power and authority to execute, deliver and perform this Lease and all documents to be executed pursuant to this Lease.

[SIGNATURES BEGIN ON FOLLOWING PAGE]

IN WITNESS WHEREOF, each of the parties hereto has caused this Lease to be duly executed under seal as of the date above written.

**LANDLORD:**

**BROWN PELICAN FARMS LLC,**
a Delaware limited liability company

By: Manulife Investment Management Timberland and Agriculture Inc
Its Manager

By:
Name:  David Baughman
Title:   Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

[SIGNATURE PAGE TO AGRICULTURAL LEASE]

20

**TENANT:**

**Berry Capital Management, LLC**, a North
Carolina limited liability company

By: Carolina Financial Group, LLC, a North Carolina
    limited liability company, its Manager

By: _____
Name:  Bruce Victor Roberts
Title:  Manager

# EXHIBIT A

# PREMISES

Being all of that 1496.99 acres tract of land located in Frenches Creek Township, Bladen County, North Carolina and being more particularly described as follows: Commencing at an existing iron bolt in the centerline of SR No 1534 Over Lyon Road at a Cul-d-sac at the end of said highway, said point having NC Grid NAD 83 (2011) coordinates of N: 276425.52' E: 2197509.96' and running the following tie lines N 27° 04' 21" E, a distance of 487.33' to an existing iron pipe and S 50° 40' 45" E, a distance of 65.71' to an existing iron stake at the Point of Beginning. Leaving the Point of Beginning and running as follows: N 47° 06' 46" E, a distance of 128.66' to an existing iron axle; thence N 58° 38' 17" W, a distance of 176.91' to an existing iron pipe; thence S 83° 17' 57" W, a distance of 143.10' to an existing iron stake; thence S 86° 19' 44" W, a distance of 280.79' to an existing iron stake; thence N 20° 03' 14" W, a distance of 329.83' to an existing iron stake; thence N 11° 37' 39" W, a distance of 199.40' to an existing iron stake; thence N 20° 40' 23" W, a distance of 289.19' to an existing iron pipe; thence N 31° 06' 39" W, a distance of 113.61' to an existing iron pipe in the centerline of an existing 40' wide r/w easement at a corner of the Alexander Lawrence Land; thence N 47° 44' 15" E, a distance of 258.93' to an existing iron pipe; thence N 29° 32' 22" W, a distance of 1581.94' to an existing railroad tee iron; thence S 47° 34' 21" W, a distance of 82.69' to an existing iron stake in the centerline of the above mentioned 40' wide R/W Easement at the end of said easement; thence S 47° 34' 21" W, a distance of 9.61' to an existing railroad tee iron; thence N 11° 57' 20" W, a distance of 92.90' to an existing iron stake; thence N 11° 07' 27" W, a distance of 920.54' to an existing railroad iron; thence N 04° 59' 59" E, a distance of 212.79' to an existing iron stake; thence N 24° 06' 41" E, a distance of 190.21' to an existing iron pipe; thence N 35° 59' 59" E, a distance of 310.60' to an existing iron pipe; thence N 33° 16' 35" E, a distancˊ of 289.97' to an existing iron stake; thenˊe Nˈˈ57° 07' 31" E, a distancˊ of 684.49' to an existing iron stake; thence N 71° 07' 43" E, a distance of 343.69' to an existing iron stake; thence N 89° 30' 25" E, a distance of 713.09' to an existing iron pipe; thence N 53° 32' 07" E, a distance of 302.46' to an existing iron stake; thence S 80° 11' 43" E, a distance of 739.50' to an existing iron stake; thence S 73° 19' 45" E, a distance of 818.19' to an existing iron stake; thence S 73° 34' 15" E, a distance of 297.13' to an existing iron stake; thence S 64° 52' 59" E, a distance of 990.27' to an existing iron stake; thence S 57° 17' 10" E, a distance of 994.69' to an existing iron stake; thence S 48° 23' 56" E, a distance of 1359.57' to an existing iron stake; thence S 37° 42' 33" E, a distance of 375.86' to an existing iron stake; thence S 21° 57' 52" E, a distance of 758.20' to an existing iron stake; thence S 37° 49' 46" E, a distance of 120.72' to an existing iron stake; thence N 50° 53' 47" E, a distance of 577.73' to an existing iron stake; thence N 25° 07' 58" W, a distance of 31.85' to an existing iron stake; thence N 59° 45' 35" W, a distance of 44.40' to an existing iron stake; thence N 85° 55' 37" W, a distance of 74.43' to an existing iron stake; thence N 56° 19' 34" W, a distance of 105.66' to an existing iron stake; thence N 74° 09' 05" W, a distance of 116.90' to an existing iron stake; thence N 57° 53' 07" W, a distance of 137.11' to an existing iron stake; thence N 48° 58' 42" W, a distance of 219.16' to an existing iron stake; thence N 41° 04' 48" W, a distance of 162.02' to an exiˈting iron stake; thence N 32° 08' 46" W, a ˈistˈnce of 94.86' to an exisˈing iron stake; thence N 25° 45' 21" W, a distance of 47.89' to an existing iron stake; thence N 08° 04' 51" W, a distance of 110.92' to an existing iron stake; thence N 03° 11' 44" W, a distance of 172.73' to an existing iron stake; thence N 21° 01' 32" E, a distance of 41.30' to an existing iron stake; thence N 31° 39' 25" E, a distance of 64.63' to an existing iron stake; thence N 40° 05' 43" E, a distance of 39.70' to an existing iron stake; thence N 52° 55' 39" E, a distance of 79.05' to an existing iron stake; thence N 57° 22' 31" E, a distance of 62.75' to an existing iron stake; thence N 83° 10' 53" E, a distance of 126.90' to an existing iron stake; thence N 88° 02' 58" E, a distance of 314.13' to an existing iron stake; thence S 53° 26' 15" E, a distance of 115.95' to an existing iron stake; thence S 59° 08' 42" E, a distance of 151.33' to an existing iron stake; thence S 39° 09' 28" E, a distance of 343.49' to an existing iron stake; thence S 18° 06' 20" E, a distance of 360.47' to an existing iron stake; thence S 14° 05' 53" W, a distance of 166.64' to an existing iron stake;

thence N 38° 46' 04" E, a distance of 105.96' to an existing iron stake; thence N 04° 28' 38" E, a distance of 462.00' to an existing iron stake; thence N 12° 21' 22" W, a distance of 299.20' to an existing iron pipe; thence S 70° 55' 21" E, a distance of 424.48' to an existing iron stake; thence S 79° 52' 26" E, a distance of 272.53' to an existing iron stake; thence S 53° 52' 52" E, a distance of 1409.14' to an existing iron stake; thence S 59° '8' 46" E, a distance of 174.44' to an existing iron stake; thence S 41° 57' 43" E, a distance of 1150.92' to an existing iron stake; thence S 25° 31' 43" E, a distance of 405.75' to an existing iron pipe; thence S 26° 29' 28" W, a distance of 3887.40' to an existing iron pipe; thence S 63° 30' 32" E, a distance of 1054.87' to an existing iron axle; thence S 31° 00' 01" W, a distance of 1834.43' to an existing iron axle; thence N 61° 29' 31" W, a distance of 656.03' to an existing concrete monument; thence N 46° 14' 22" W, a distance of 1235.28' to an existing concrete monument; thence S 80° 39' 59" W, a distance of 337.99' to an existing concrete monument; thence S 01° 10' 01" E, a distance of 120.70' to an existing concrete monument; thence S 15° 09' 59" W, a distance of 448.80' to an existing concrete monument; thence S 59° 24' 59" W, a distance of 636.90' to an existing concrete monument; thence S 81° 23' 59" W, a distance of 385.00' to an existing concrete monument; thence N 69° 10' 01" W, a distance of 278.00' to an existing concrete monument; thence S 89° 19' 59" W, a distance of 275.50' to an existing iron pipe; thence N 47° 55' 01" W, a distance of 350.00'to an existing concrete monument; thence N 62° 26' 02" W, a distance of 393.76' to an existing iron pipe; thence N 50° 08' 22" W, a distance of 837.03' to an existing concrete monument; thence N 24° 35' 26" W, a distance of 384.49' to an existing concrete monument; thence N 24° 35' 26" W, a distance of 289.50' to an existing iron stake; thence N 79° 31' 02" W, a distance of 229.20' to an existing iron stake; thence N 21° 51' 02" W, a distance of 244.00' to an existing concrete monument; thence N 43° 29' 02" W, a distance of 311.02' to an existing iron stake; thence N 07° 10' 38" W, a distance of 247.80' to an existing iron stake; thence N 59° 10' 38" W, a distance of 428.46' to an existing iron pipe; thence N 20° 33' 22" W, a distance of 634.11' to an existing iron stake; thence N 50° 04' 28" W, a distance of 655.83' to an existing iron stake; thence N 51° 38' 56" W, a distance of 23.45' to an existing iron stake; thence N 50° 07' 44" W, a distance of 23.30' to an existing iron stake in the northern edge of an existing 40' wide R/W Easement; thence running with the northern edge of s'id Easement as follows: S 70° 44' 47" W, a distance of 614.88' to an existing iron stake; thence N 19° 44' 53" W, a distance of 1020.79' to an existing iron stake; thence N 50° 40' 45" W, a distance of 309.29' to the Point of Beginning.

Said parcel containing 1496.99 Acres, more or less as shown on that survey by M. Shelton Bordeaux entitled ALTA/NSPS Land Title Survey Brown Pelican Farms LLC dated October 1, 2021, signed and sealed January 25, 2022.


TOGETHER WITH THOSE EASEMENTS AS SET FORTH IN THAT CERTAIN DEED OF EASEMENT FILED FOR RECORD DECEMBER 20, 2017 AND RECORDED IN INSTRUMENT NO. 03842 AND RECORDED IN BOOK 769, PAGE 970, AFORESAID RECORDS.

**EXHIBIT B**

**RENT PAYMENT SCHEDULE**

Base Property Value as of Commencement Date: $15,300,000.00

Lease Factor as of Commencement Date: 8%

Annual Base Rent Escalation:  3% annually

| Date | Base Rent | Crop Proceeds Rent** | Capital Expenditure Assessment Repayment*** |
|------|-----------|----------------------|---------------------------------------------|
| Commencement Date | | | |
| | | | |
| 3/31/2022 | $ 1,224,000 | | |
| 1/1/2023 | | $266,301 | $92,919 |
| 8/31/2023 | $ 1,260,720 | | |
| 1/1/2024 | | $252,021 | $215,650 |
| 8/31/2024 | $ 1,298,542 | | |
| 1/1/2025 | | $237,741 | $235,394 |
| 8/31/2025 | $ 1,337,498 | | |
| 1/1/2026 | | $223,461 | $258,466 |
| 8/31/2026 | $ 1,377,663 | | |
| 1/1/2027 | | $209,181 | $285,989 |
| 8/31/2027* | $ 1,515,385 | | |
| 1/1/2028 | | $277,011 | $319,760 |
| 8/31/2028 | $ 1,560,847 | | |
| 1/1/2029 | | $344,841 | $319,760 |
| 8/31/2029 | $ 1,607,672 | | |
| 1/1/2030 | | $359,121 | $319,760 |
| 8/31/2030 | $ 1,655,902 | | |
| 1/1/2031 | | $373,401 | $319,760 |
| 8/31/2031 | $ 1,705,579 | | |
| 1/1/2032 | | $387,681 | $319,760 |

*Base Property Value to be adjusted effective January 1, 2027 pursuant to Section 2(a)(iii)

**For example only

***Estimate, subject to adjustment

# **EXHIBIT C**

# **FARMING AGREEMENT**

CONTRACT FARMING AGREEMENT

This CONTRACT FARMING AGREEMENT is entered into as of this XX day of XXXXXXX, 202X by and between Berry Capital Management, LLC (the "**Lessee**"), and Carolina Berry Group, LLC (the "**Grower**").

WHEREAS, Lessee has certain rights to the Farmlands, as further described herein, pursuant to that certain Agricultural Lease by and between Brown Pelican Farms LLC, as Landlord, and Lessee, as Tenant, dated January _____, 2022 attached hereto as Exhibit A (the "Agricultural Lease");

WHEREAS, Lessee wishes to retain the Grower for the cultivation and distribution of blueberries.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

1. Farmlands.

   a. The "**Farmlands**" means those certain lands located at XXXXXXXXXX.

   b. Grower is in the business of cultivating, planting, and harvesting Products (as defined below, with such activities being referred to herein as the "**Farming Activities**").

   c. The parties desire for Grower to conduct Farming Activities on the Farmlands.

   d. As used herein, the term "**Products**" means all parts of blueberry plants, whether growing or not, along with the seeds thereof.

2. License.

   a. Lessee hereby grants to Grower and its agents and employees, collectively, its "**Representatives**") during the Term a revocable license (the "**License**") to the Farmlands, together with reasonable ingress and egress access thereto (the "**License Areas**") for sole purpose of performing the Farming Activities thereon, on and subject to the terms and conditions herein. Lessee will own all existing and future improvements and fixtures made or installed upon the License Areas, whether constructed or installed by Grower or a related party, and Grower waives any ownership rights or claims thereto.

   b. In connection with the Farming Activities on the License Areas, Grower shall (and shall cause its Representatives to) use the highest standard of care to keep all work areas within the License Areas safe and to properly construct and secure all work areas created or used by Grower or its Representatives to prevent harm to Lessee and their employees, agents, invitees and property. Grower shall (and shall cause its

Representatives to) use the highest standard of care to keep any equipment used or brought into the Farmlands by Grower or its Representatives under its absolute and complete control at all times, and said equipment shall be used only in the License Areas and, in all circumstances, at the sole risk of Grower. Grower shall (and shall cause its Representatives to) perform all Farming Activities with the highest due care diligence and in cooperation with Lessee and its customers, employees, agents and in invitees to avoid accident, damage or harm to persons or property and unreasonable delay to or interference with the operations or business of such parties. Grower shall (and shall cause its representatives to) conduct the Farming Activities in a manner and at times that are intended to minimize any impairment of access or traffic by the aforementioned parties, or other inconvenience or disturbance to the operations or business of such parties.

c.   Grower shall (and shall cause its Representatives to) strictly comply with: (i) all applicable federal, state and local laws (including without limitation, environmental laws), in the conduct of all Farming Activities and while on the License Areas, and (ii) generally accepted professional and industry standard. Grower, at its sole cost and expense, shall be responsible for obtaining and maintaining any and all permits and approvals from any governmental authority that may be necessary for it to conduct the Farming Activities. Grower shall be solely responsible for and ensure that all government-required inspections or reports, if any, regarding the Farming Activities are properly and timely conducted or submitted.

d.   Grower shall be solely responsible for, and be considered the generator of, all wastes associated with Farming Activities. No Hazardous Materials (defined below) should result from any of the Farming Activities. As used herein, "**Hazardous Materials**" means all hazardous or toxic substances, wastes, materials (whether solids, liquids or gases) or chemicals, petroleum (including crude oil or any fraction thereof) and petroleum products, asbestos and asbestos-containing materials, pollutants, contaminants and by-products regulated pursuant to or forming the basis of liability under any Environmental Law. "**Environmental Law**" means any applicable laws or orders relating to the protection of the environment or natural resources or human health and safety as it relates to environmental protection, and relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control or cleanup of any Hazardous Materials in the environment and including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.) the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), and the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et

seq.) and their state and local counterparts, to the extent each is applicable and as each has been amended and the regulations promulgated pursuant thereto.

e.   Grower shall pay Lessee an equitable percentage for Grower's use of all utilities supplied to the Farmlands by any utility company, whether public or private, including but not limited to, fuel, water gas, sewage, common security, electricity and other charges incurred by Grower in providing utilities to the Farmlands, as reasonably determined by Lessee. Such sums shall be paid by Grower within 15 days of invoice therefor. Such utilities shall exclude telephone, wi-fi, and internet service which shall be separately installed and provided for by each party with their own respective service providers.

f.   Grower will not permit any mechanics', materialmens or other similar liens or claims to stand against the Farmlands for labor or material furnished in connection with any Farming Activities performed by Grower or its Representatives. Upon written notice of any such lien or claim delivered to Grower by Lessee, Grower shall either immediately (i) pay and discharge such lien or claim, or (ii) bond and contest the validity and the amount of such lien, provided Grower (a) immediately pays any judgment rendered; (b) immediately pays all proper costs and charges; and (c) has the lien or claim released at its sole expense. This Section shall survive the expiration or termination of this Agreement.

g.   Grower hereby agrees to indemnify, defend (with counsel reasonably acceptable to Lessee), and hold harmless Lessee and its employees, officers, directors, shareholders, partners, members, agents, representatives, affiliates, lenders, successors and assigns (each, an "**Indemnified Party**"; collectively, the "**Indemnified Parties**") from and against any and all liabilities, claims, suits, actions, judgments, demands, costs, damages, fines, penalties, losses and expenses (including but not limited to reasonable attorneys' fees) (collectively, "**Losses**"), including but not limited to Losses related to environmental contamination, environmental laws, the handling of Hazardous Materials, natural resource damage or remediation, incurred or suffered by, or claimed against any Indemnified Party (which shall include claims against Lessee by another Indemnified Party, and shall exclude consequential or special or punitive damages), which may arise, directly or indirectly, in whole or in part, from, out of, by reason of or in connection with the performance of the Farming Activities by Grower or its Representatives (whether or not due to negligence or misconduct) or out of Grower's failure to perform any of its obligations under this Agreement; provided, however that such obligation to indemnify, defend and hold Lessee and the Indemnified Parties harmless shall not be applicable to any Losses arising from the willful or grossly negligent acts of the applicable Indemnified Party. Lessee agrees to give notice to Grower of any claims or alleged liabilities received or incurred by Lessee that are subject to this indemnification. Lessee shall reasonably cooperate with Grower in defending or resisting such claims. Notwithstanding any other provision of this

Agreement, Lessee reserves its rights to assert, and does not release Grower from, any statutory or common law claims that Lessee may have against Grower for any Losses arising out of or in any way related to the Farming Activities (excluding consequential or special damages and/or punitive damages). Grower's obligations to the parties under this Section shall not be impaired by Lessee's assignment of its rights and/or delegation of its duties, and such obligations to Lessee shall continue in full force and effect notwithstanding any such assignment or delegation. This Section shall survive the expiration or termination of this Agreement.

3. <u>Revenue Share</u>. As part of the consideration for the License, Grower shall pay Lessee the following shared revenues (the "**Shared Revenues**"):

    a. TO BE DETERMINED.

    b. As used herein, "**Gross Sales**" means the entire amount of the sale price of all Products sold and the charges for all services and all other receipts in connection with Products sold by Grower, its subsidiaries, other affiliates and/or joint venture partners, whether or not related to Products derived from the Farmlands, the License Areas or elsewhere and irrespective of whether the agent for the sale is Grower, its subsidiary, affiliate, or joint venture partner, whether (wholly or partially) for cash or credit, and shall include charges for equipment leased and reimbursements actually received from third parties in respect of the foregoing.

    c. <u>Records and Audit Rights</u>. Grower agrees to accurately record all sales in accordance with generally accepted accounting practices, and to maintain sufficient original records which accurately summarize all transactions relating to the Gross Sales (including the sales of subsidiaries, other affiliates and joint venture partners). Original records shall include but not be limited to: sales documents, invoices, cash receipts, payroll journals, accounts receivable, disbursement journals, bank statements, deposit slips, inventory records, purchase orders, receiving records, sales journals or daily sales reports, orders accepted by means of electronic, telephonic, video, computer or another electronic or other technology based system, state sales and use tax returns (and all documentation used to prepare the returns), and a complete general ledger. Records shall be preserved (properly totaled) by Grower either (a) at the Farmlands or (b) at the home or regional offices of Grower (provided Lessee shall be notified in writing of the address at which the records are maintained) and made available to Lessee at such location upon demand, for a period of at least 3 years after the year in which the sales occurred (however, if any audit is begun by Lessee or if there is a dispute regarding Gross Sales, Grower's records shall be retained by Grower until a final resolution of the audit or dispute). The receipt by Lessee of a statement of Gross Sales shall not constitute an admission of its correctness. Lessee shall be entitled, at Lessee's expense, to have at any time and from time to time an audit of the Gross Sales made during any period covered by the annual statement and account and to recalculate

the Shared Revenues payable for that period. If there is a deficiency in the payment of Shared Revenues, the deficiency shall be immediately due and payable with interest at a rate equal to 3% in excess of the annual prime interest rate being charged at the time by JP Morgan Chase, or any successor thereto, accruing from the date when the payments should have been made until paid. If there is an overpayment by Grower, it shall be credited against future Shared Revenue payments due. If Gross Sales have been understated by more than 2% or Grower fails to record, maintain or make available the required sales supporting documentation, Grower shall be in default, and shall pay the cost of the audit and all other related costs and expenses. If Grower is late furnishing Lessee any monthly Gross Sales statement, Lessee shall have the right, without notice, to conduct an audit at Grower's sole cost. If Grower does not furnish the Gross Sales documentation referred to above or otherwise impedes Lessee's audit of Gross Sales, Lessee shall be entitled, in addition to Lessee's other rights and remedies, to estimate Grower's annual Gross Sales as 125% of the Gross Sales for the preceding year, and bill Grower for any Shared Revenues which may be due based upon the estimated Gross Sales.

4. <u>Term.</u>

   a. This Agreement shall be effective on the date hereof, and shall continue for a term of XX crop seasons (the "**Initial Term**", where each crop season is denoted as the period beginning on XXXXXX of each year, and ending on XXXXX of the following year (each, a "**Crop Season**"). The first Crop Season commences on XXXXXXX, 2022. Lessee may extend the Initial Term for another 5 Crop Seasons by written notice to Grower at least 180 days prior to the end of the Initial Term ("**First Extended Term**"), and Lessee may extend the First Extended Term for another 5 Crop Seasons by written notice to Grower at least 180 days prior to the end of the First Extend Term. The Initial Term, and any period that this Agreement shall continue following the Initial Term, shall be collectively referred to as the "**Term.**"

   b. Upon end of the Term, Grower agrees to vacate and surrender the License Areas, including, without limitation, any and all fixtures and improvements thereon, to Lessee, in good operating condition and repair, reasonable wear and tear excepted. As part of vacating the License Areas, Grower shall remove all its equipment and personal property, and restore any damage resulting from the removal thereof. Grower acknowledges that Grower's failure to so vacate the License Areas and so remove its equipment and personal property on or prior to the end of the Term in such condition may subject Lessee to significant costs and expenses arising from such failure. Accordingly, Grower agrees that it shall be wholly responsible for all costs and expenses incurred by Lessee arising from Grower's failure to do so. This Section shall survive the expiration or termination of this Agreement.

5.  Insurance Requirements.

   a.  Policy Requirements. Upon Grower's execution of this Agreement, and prior to Grower or its Representatives conducting any Farming Activities, Grower shall furnish to Lessee, at Grower's expense, satisfactory certificates of insurance listing Lessee as an additional insured on the policies listed below (with the exception of the Worker's Compensation/Employer's Liability policy), evidencing that Grower (or its applicable Representatives, in the case the Farming Activities will all be conducted by Grower's Representatives) have the following insurance in full force and effect meeting the requirements set ford below:

| Insurance Type | Limits |
|---|---|
| Worker's Compensation/Employer's Liability | Statutory/$500,000 |
| General Liability | $1,000,000/occurrence $2,000,000/aggregate |
| Umbrella Liability | $9,000,000/occurrence $9,000,000/aggregate |
| FDA Crop Insurance | Statutory |

   b.  Maintenance of Coverage; Policy Types. Grower will ensure that all applicable Representatives maintain the aforesaid coverages during the Term. Any insurance required hereby may be maintained under a blanket policy or an umbrella policy insuring other parties and other locations so long as such policy satisfies the foregoing requirements. Any coverage written on a "claims-made" basis shall be kept in force, either by renewal or the purchase of an extended reporting period, for a minimum period of three (3) years following the termination or expiration of this Agreement. Nothing in this Section shall in any way limit Grower's liability under this Agreement or otherwise.

   c.  This Section 5 shall survive the expiration or termination of this Agreement.

6.  Growing, Harvesting, Packing and Handling the Crops.

   a.  Performance. Grower agrees to perform, as an independent contractor, all the necessary services and efforts to plant the crops and manufacture the Products and to bring the crops and Products to a position where they are ready for harvesting, packing, and selling. Grower agrees to grow the crops and manufacture the Products in accordance with all laws and regulations governing agricultural processes and the best agricultural practices prevailing in the area of the Farmlands, and shall take all actions consistent with prudent farming and manufacture methods to accomplish the proper care, growth and production of the same. Grower shall take all precautions necessary to ensure that all operations undertaken by Grower are sanitary for the purpose of

preventing the crops or Products from being subject to contamination that could harm the crops or Products or interfere with the marketability of all or any portion of the crops or Products. Grower warrants that the crops and Products will not be adulterated within the meaning of the Federal Food, Drug and Cosmetic Act, nor subject to, nor contaminated with any chemicals, pesticides, fungicides and herbicides prohibited by federal or state statutes or regulations. Grower agrees to maintain a listing of all chemicals, pesticides, fungicides and herbicides applied to the crops and/or Products. Grower shall exercise due diligence in the planting, growing, harvesting, manufacturing and packing of the crops and Products.

b.  Grower shall be responsible for the direct payment for all services, material, land, equipment, seed, nursery plants, herbicides, pesticides, other chemical products, labor, water, water sources, irrigation system, drip irrigation pipe, mulch, supplies, and other items related to the planting, cultivating, irrigating, weeding, thinning, hoeing, dusting, spraying, fertilizing, and otherwise growing the crops to completion, and to the harvesting, manufacture packing, hauling, and distributing of the Products (individually and collectively, and as supplemented below, the "**Growing Expense(s)**"). Growing Expenses include all rent and other payments owing by Grower, its subsidiaries, other affiliates and joint venture partners in production of the Products.

c.  <u>Chemical and Pesticide Residues</u>. In connection with growing the crops, Grower shall take all commercially reasonable actions possible to ensure full compliance with all federal, state and local regulations and procedures concerning chemical usage and any other matters related to its business. Grower acknowledges that it will comply with the good agricultural and manufacturing practices for growing, harvesting, manufacturing and food safety requirements. If Grower becomes aware of any factor(s) which may negatively affect the crops, the Products, their quality, and/or their marketability, Grower shall promptly provide written notice to Lessee of the same. Grower agrees not to introduce any substance (including, without limitation, chemicals, pesticides or growth regulators) on the crops, Products or on the Farmlands, which will be in violation of established toxic tolerance levels, or any other federal, state or local law, rule, regulation or ordinance, which would cause the crop or Products to be adulterated or misbranded in accordance with applicable laws, or which are not authorized by Lessee for the crops being grown or Products being manufactured. Grower further warrants that it will do nothing to cause or permit the crops or Products to contain any chemical residues prohibited by, or in excess of the tolerances established by, all applicable laws. Upon request, Grower will provide Lessee with reports of both current and past chemical use and crop history for the Farmlands and lands on which the crops that are used in connection with the Products are to be grown. Such reports shall include all chemicals used, crops planted, and information on crops surrounding the current planted crops. Grower agrees that if any chemical residues on the crops or

Products exceed tolerances permitted by applicable law, the parties shall meet and discuss the cause, solution and best course of action to deal with the situation.

d. <u>Labor</u>. All persons working in Grower's business operations are employees or independent contractors of Grower and are under Grower's sole direction and control. Grower shall have exclusive responsibility for ensuring that its employees and independent contractors handle and use herbicides, pesticides, and other chemical products in accordance with federal, state, and local laws and regulations, and label requirements. Grower shall have exclusive responsibility for ensuring that its employees and independent contractors comply with any and all federal, state, and local immigration laws and regulations. Grower shall have exclusive control over its employees' and independent contractors' hours and manner of work, compensation, and housing and over any labor negotiations. Neither Lessee shall have any right whatsoever to direct or control any of Grower's employees and independent contractors. Grower shall comply with any and all federal, state, and local income and payroll tax withholding requirements and shall carry all necessary liability insurance and Worker's Compensation insurance for its employees. By this paragraph, Grower is not assuming any liability for actions of its independent contractors it would not otherwise have, but it shall be responsible to Lessee for all of its obligations hereunder, whether performed by Grower or its independent contractors, and shall hold Lessee harmless from any liability that Grower might otherwise bear related to nonperformance of an obligation by an independent contractor of Grower.

7. <u>Risk of Loss.</u> Grower shall have and retain title to and bear all market risks and risks of loss to the crops and Products from initial planting until title passes to the customer.

8. <u>Force Majeure.</u> No party hereunder shall be required to perform or be liable for loss or damage suffered by the other parties if caused by unavailability of labor, strikes, or lockouts; shortages of equipment, materials, supplies, transportation or water; the elements; adverse weather conditions; unavoidable casualties; war; hostilities; governmental action or order; delays caused by governmental authorities or the inability to obtain required governmental approvals; mechanical breakdown, power failures; civil disorder; acts of God; or other events beyond the parties' reasonable control, and the date of completion for such obligation shall be extended (but not excused) by the period of time taken by any such delay. However, in the event that a party shall be unable to perform any part of its obligations and duties hereunder, it shall promptly advise the other parties of the extent of its inability to perform. All parties agree that the course of action will be mutually agreed upon and will further determine if the aforementioned event is temporary or permanent. Notwithstanding the foregoing, the parties shall remain obligated to pay any sums of money owed by either of them to the other pursuant to this Agreement.

9. <u>Good Faith Judgment</u>. The parties shall not be liable to each other for errors in judgment in exercising their rights or discharging their obligations under this Agreement. Nothing in this

Agreement limits or abrogates each party's covenant to act in good faith and to deal fairly with the other parties.

10. <u>Parties' Review of Performance</u>. The parties and their representatives shall regularly meet and/or discuss all operations under this Agreement. Such meeting or discussion topics shall include, but not be limited to, Farming Activities, market and quality conditions, movement of Products, shipping schedules, distribution of crops, adjustments and any circumstances affecting operations hereunder. Any agreements made on required courses of action shall be documented in writing.

11. <u>Defaults</u>. A party shall be in default of this Agreement if it shall fail to observe or perform any of the material covenants, conditions or provisions of this Agreement to be observed or performed by such party, and such failure shall continue for a period of fifteen (15) calendar days after written notice thereof from another party; provided, however that if the nature of the party's default is such that more than fifteen (15) calendar days are reasonably required for its cure, then such party shall not be deemed to be in default if it commenced such cure within said fifteen (15) calendar day period and thereafter diligently prosecutes such cure to completion. Upon a default, the non-defaulting party shall be entitled to: (a) terminate this Agreement upon written notice to the defaulting party, (b) obtain equitable remedies that include, but are not limited to, specific performance, (c) obtain damages, excluding consequential, extraordinary or punitive damages, all of which are hereby waived, and (d) cure such breach (for which purpose Lessee is granted a license to enter onto the Farmlands) and charge defaulting party for the costs of such cure.

12. <u>Agricultural Lease</u>. This Lease is subject to and subordinate to the Agricultural Lease. In the event of a conflict between the terms of this Agreement and the Agricultural Lease, the Agricultural Lease shall control.

13. <u>Miscellaneous</u>.

    a. *Entire Agreement*. There are no oral agreements or representations between the parties not contained herein. This Agreement may only be altered or changed by agreement in writing signed by the parties.

    b. *Assignment*. This agreement shall be binding on and inure to the benefit of the heirs, executors, administrators, successors and assigns of the signatories hereto. Notwithstanding the foregoing, no party shall have the right to assign this Agreement without the prior written consent of the other parties.

    c. *Dispute Resolution*. If the parties are unable to resolve any dispute(s), brought to enforce the terms of this agreement, all parties agree to submit to the sole and exclusive jurisdiction of the United States District Court of the Middle District of North Carolina and agree to venue therein. In the event that such jurisdiction is unavailable, the parties

agree to the sole and exclusive jurisdiction of the state courts of North Carolina located within Forsyth County and agree to venue therein.  This Agreement shall be governed by the internal laws of the State of North Carolina, without consideration for principles of conflicts of laws.

d.   *Notice*. Any notices required by this Agreement shall be deemed given forty-eight (48) hours after the posting thereof in the United States mail, first class, certified, postage prepaid, return receipt requested, properly addressed to the party to be served at the address of such party as follows or at the time of the personal service of such notice, or when electronically mailed and flagged as "High-Importance". Any party may change its address for notices by notice to the other parties:

| Grower | Lessee |
|---|---|
|  |  |

e.   *No Partnership*. Lessee and Grower shall each operate as independent businesses, each acting for its own individual account and profit and not for any joint business of the parties. The parties do not intend to create and are not creating a partnership, joint venture, syndicate, group, pool, or other unincorporated organization for the purpose of carrying on any joint business or financial operation. No party shall by this Agreement obtain any rights to the operational control or other proprietary interests of any other party's business, and each party intends to enter and is entering into this Agreement as a separate business and as an independent contractor. No party shall be responsible for the actions or agreements of the other parties, nor shall any party have any authority to create any obligation of the other. No party shall be responsible for any expenses or losses had by the other parties except as may be specifically set forth herein.

f.   *Counterparts*. This Agreement may be executed in two or more counterparts, each of which shall be deemed original, but all of which taken together shall constitute one and the same instrument.

g.   *Attorney's Fees*. In the event of any claim, dispute or controversy arising out of or relating to this Agreement, including an arbitration or an action for declaratory relief, the prevailing party, after all appeal rights have been exhausted, shall be entitled to recover its court costs and reasonable out-of-pocket expenses, including, but not limited to, phone calls, photocopies, expert witnesses, travel, etc., and reasonable attorneys' fees to be fixed by the arbitrator or court. Such recovery shall include court costs, out-of-pocket expenses and attorneys' fees on appeal, if any. The arbitrator or court shall determine who is the "prevailing party," but only if the dispute or controversy represents a final judgment.

h.  *Enforceability*. If any provision of this Agreement, or its application to any circumstance, is held by a court of competent jurisdiction to be invalid or unenforceable, then all other provisions of this Agreement will continue in full force and effect and a suitable and equitable provision will be substituted for the invalid or unenforceable provision in order to carry out, so far as may be practical and permitted under applicable law, the purpose of this Agreement.

i.  *Interpretation*. Headings in this Agreement are for the convenience of the parties and do not affect the meaning of this Agreement. Exhibits referred to in this Agreement are incorporated herein, whether or not attached. This Agreement has been negotiated by the parties and shall be interpreted in a fair and reasonable manner, and not for or against either party based on which drafted this Agreement or any provision hereof. The word "including" means "including without limitation".

In witness whereof, the parties have executed this agreement as of the date first above written.

**<u>EXHIBIT D</u>**

**<u>DEVELOPMENT PLAN AND</u>**
**<u>BUDGET</u>**

[See attached]

## Plant Order Sumary / Timeline by Variety

### GENERAL INFORMATION

| Order by Variety | Harvest | Delivery | Supplier | Size | TYPE | Ordered? | Paid? |
|---|---|---|---|---|---|---|---|
| Legacy | MID | Feb-22 | Carolina Blueberry | Gallon | New Development | YES | REIMBURSEMENT |
| Legacy | MID | Fall 2022 | PHYLLA TECH | 21 cell | New Development | YES | NEED DEPOSIT |
| New Hanover | EARLY-MID | Fall 2022 | PHYLLA TECH | 21 cell | New Development | YES | NEED DEPOSIT |
| Oneil | EARLY-MID | Fall 2022 | PHYLLA TECH | 21 cell | New Development | YES | NEED DEPOSIT |
| Legacy | MID | Spring 2022 | Phylla Tech | 21 cell | New Development | YES | NEED DEPOSIT |
| Blue Ribbon | EARLY | Spring/Fall 2023 | FALL CREEK | Liter | New Development | NO | NEED DEPOSIT |
| Legacy | MID | Spring 2024 | FALL CREEK | Liter | RE Development | NO | NO |
| Overtime | EARLY | FALL 2024 | FALL CREEK | Liter | RE Development | NO | NO |
| Legacy | MID | Spring 2025 | PHYLLA TECH | 21 cell | RE Development | NO | Not need yet |

**TOTAL**

### EXPENSE FLOW CAPEX

| | 2022 | 2023 | 2024 | |
|---|---|---|---|---|
| Land Development | $ 611,325.00 | $ 611,325.00 | 652,080.00 | |
| Plants | $ 373,550.00 | $ 415,250.00 | 320,740.00 | |
| | $ 984,875.00 | $ 1,026,575.00 | $ 972,820.00 | $ 2,984,270.00 |

| ACRES ADDED | 75 | 75 | 100 |
|---|---|---|---|

**Room for Expansion**

**100 Acres- is listed as Added- not redevelopment in cost model- reason being setup to intermix as needed based off older varieties production and revenue basis.**

Notwithstanding anything in this Exhibit to the contrary, Landlord's obligation to reimburse Tenant for Expansionary Capital Expenditures shall be as set forth in Section 2(d) of the Lease.

| QUANTITY | | | COST PER PLANT | | | | TOTAL & PER ACRE | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| # Plants | Plants / Acre | Acres | $ / Plant | -)Royalty | Shipping | (=)Total | Total $ | $ / Acre | |
| 30,000 | 1,550 | 19.4 | 3.05 | - | 0.17 | 3.22 | 96,600 | 4,991 | |
| 80,000 | 1,550 | 51.6 | 2.00 | - | - | 2.00 | 160,000 | 3,100 | |
| 10,000 | 1,550 | 6.5 | 2.00 | - | - | 2.00 | 20,000 | 3,100 | |
| 10,000 | 1,550 | 6.5 | 2.00 | - | - | 2.00 | 20,000 | 3,100 | |
| 80,000 | 1,550 | 51.6 | 2.00 | 0.30 | - | 2.30 | 184,000 | 3,565 | |
| 30,000 | 1,550 | 19.4 | 3.05 | 0.30 | 0.17 | 3.52 | 105,600 | 5,456 | |
| 30,000 | 1,550 | 19.4 | 3.05 | - | 0.17 | 3.22 | 96,600 | 4,991 | |
| 30,000 | 1,550 | 19.4 | 3.05 | 0.30 | 0.17 | 3.52 | 105,600 | 5,456 | |
| 100,000 | 1,550 | 64.5 | 3.05 | - | 0.17 | 3.22 | 322,000 | 4,991 | Reimbursement Feb 2022 |
| - | | - | | | | | - | #DIV/0! | 25% due ASAP |
| - | | - | | | | | - | #DIV/0! | |
| - | | - | | | | | - | #DIV/0! | |
| 400,000 | 1,550 | 258.1 | | | | | 1,110,400 | 4,303 | |

| Plant Expenses 2021 | Due Feb | Balance Due Prior to Shipping August | Balance Due 2023 | Deposit Due Feb 2023 | Balance Due 2024 |
|---|---|---|---|---|---|
| $ 96,600.00 | $ 96,600.00 | | | | |
| $ 160,000.00 | $ 40,000.00 | 120,000.00 | | | |
| $ 20,000.00 | $ 5,000.00 | 15,000.00 | 157,600.00 | 26,400.00 | 79,200.00 |
| $ 20,000.00 | $ 5,000.00 | 15,000.00 | 81,450.00 | 80,500.00 | 241,500.00 |
| $ 26,400.00 | $ 26,400.00 | | 70,200.00 | 106,900.00 | 320,700.00 |
| $ 24,150.00 | $ 24,150.00 | | | | |
| $ 26,400.00 | $ 26,400.00 | | | | |
| $ 373,550.00 | $ 223,550.00 | $ 150,000.00 | $ 309,250.00 | | |

## **EXHIBIT E**

## **FORM OF LETTER OF CREDIT**

[See attached]

[MIMTA – 12/21/21]

<p style="text-align:center; color:red"><b>INSERT FILE NAME</b></p>

<p style="text-align:center; color:red"><b>**DRAFT**DRAFT**DRAFT**DRAFT**DRAFT**DRAFT**DRAFT**DRAFT**</b></p>

LETTER OF CREDIT NO. **[INSERT LETTER OF CREDIT NUMBER]**

ISSUER:
FIFTH THIRD BANK, N.A.

BENEFICIARY:
**[BENEFICIARY NAME]**
**[BENEFICIARY STREET ADDRESS]**
**[BENEFICIARY CITY, STATE ZIP]**

APPLICANT:
**[APPLICANT NAME]**
**[APPLICANT STREET ADDRESS]**
**[APPLICANT CITY, STATE ZIP]**

LETTER OF CREDIT NO:   **[INSERT LETTER OF CREDIT NUMBER]**
ISSUE DATE:            **[INSERT ISSUE DATE]**
EXPIRATION DATE:       **[INSERT EXPIRATION DATE]**
EXPIRATION PLACE:    AT OUR COUNTERS
AMOUNT: **[INSERT AMOUNT]**

ISSUER HEREBY ISSUES IN FAVOR OF BENEFICIARY THIS IRREVOCABLE STANDBY LETTER OF CREDIT ("STANDBY") IN THE MAXIMUM AGGREGATE AMOUNT OF $**[INSERT AMOUNT]** WHICH IS AVAILABLE BY PRESENTATION OF THE FOLLOWING DOCUMENT:

BENEFICIARY'S SIGNED AND DATED STATEMENT ADDRESSED TO THE ISSUER AND READING AS FOLLOWS: "WE HEREBY DEMAND PAYMENT IN THE AMOUNT OF $_____ UNDER YOUR LETTER OF CREDIT NUMBER **[INSERT LETTER OF CREDIT NUMBER]** DATED **[INSERT ISSUE DATE]**. WE CERTIFY THAT **[INSERT APPLICANT NAME]** IS OBLIGATED TO PAY US THE AMOUNT DEMANDED, WHICH AMOUNT IS DUE AND UNPAID, UNDER OR IN CONNECTION WITH THE AGREEMENT BY AND BETWEEN THEM AND US TITLED **[INSERT TITLE OF AGREEMENT]** AND DATED **[INSERT DATE OF AGREEMENT]**."

PARTIAL DRAWINGS ARE ALLOWED.
MULTIPLE DRAWINGS ARE ALLOWED.

*Optional* [THE EXPIRATION DATE OF THIS STANDBY SHALL BE AUTOMATICALLY EXTENDED FOR ADDITIONAL PERIODS OF **[INSERT LENGTH OF AUTOMATIC EXTENSION]** UNLESS ISSUER SENDS NOTICE TO BENEFICIARY AT THE ABOVE-STATED ADDRESS BY CERTIFIED MAIL, COURIER, OR OTHER RECEIPTED MEANS OF DELIVERY AT LEAST **[INSERT NUMBER OF DAYS]** DAYS PRIOR TO THE THEN-CURRENT EXPIRATION DATE THAT ISSUER ELECTS NOT TO EXTEND THE EXPIRATION DATE OF THIS STANDBY. IN NO EVENT WILL THE EXPIRATION DATE OF THIS STANDBY BE AUTOMATICALLY EXTENDED BEYOND **[INSERT FINAL EXPIRATION DATE WHEREBY LETTER OF CREDIT WILL NOT BE AUTOMATICALLY EXTENDED BEYOND]**.]

Applicant Approval of Draft LC: _____
(initials)

[MIMTA – 12/21/21]

ISSUER ENGAGES WITH BENEFICIARY THAT DOCUMENTS PRESENTED UNDER AND IN COMPLIANCE WITH THE TERMS OF THIS STANDBY WILL BE HONORED IF PRESENTED DURING BUSINESS HOURS ON OR BEFORE THE EXPIRATION DATE AT FIFTH THIRD BANK, N.A., TRADE SERVICES, 5050 KINGSLEY DRIVE, MD 1MOCBR, CINCINNATI, OH 45263.  PAYMENT AGAINST A COMPLYING PRESENTATION SHALL BE MADE BY WIRE TRANSFER TO A DULY REQUESTED ACCOUNT OF THE BENEFICIARY.

IN THE EVENT THIS STANDBY IS NO LONGER REQUIRED, THIS ORIGINAL STANDBY AND ALL ORIGINAL AMENDMENTS, IF ANY, MUST BE RETURNED TO ISSUER AT THE PLACE FOR PRESENTATION TOGETHER WITH A SIGNED LETTER ON BENEFICIARY'S LETTERHEAD ADDRESSED TO ISSUER EXPRESSLY AUTHORIZING CANCELLATION.

THIS STANDBY IS ISSUED SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998 ("ISP98"), INTERNATIONAL CHAMBER OF COMMERCE PUBLICATION 590.

ISSUER'S OBLIGATIONS UNDER THIS STANDBY ARE GOVERNED BY THE LAWS OF NEW YORK.

COMMUNICATIONS OTHER THAN DEMANDS MAY BE MADE TO ISSUER BY TELEPHONE AT 513-358-5229 OR BY TELEFAX AT 513-358-5950.  BENEFICIARY REQUESTS FOR AMENDMENT OF THIS STANDBY, INCLUDING AMENDMENT TO REFLECT A CHANGE IN THE BENEFICIARY'S ADDRESS, SHOULD BE MADE TO APPLICANT, WHO MAY THEN REQUEST ISSUER TO ISSUE THE DESIRED AMENDMENT.

_____        _____
AUTHORIZED SIGNATURE                 AUTHORIZED SIGNATURE

Applicant Approval of Draft LC: _____
                                (initials)

Classification: Confidential

**EXHIBIT F**

**FORM OF GUARANTY**

[See attached]

Date: January 28, 2022                                              R.E.# BP00008 - Bladen 53

## LEASE GUARANTY

This LEASE GUARANTY ("Guaranty") is made as of the 28th day of January, 2022 by **BRICKLYN ROOKS** ("Guarantor") in favor of **BROWN PELICAN FARMS LLC** ("Landlord").

## RECITALS

A.      Landlord and **Berry Capital Management, LLC** ("Tenant") desire to enter into that certain Agricultural Lease with common date hereof (the "Lease") with respect to certain agricultural property located in Bladen County, North Carolina (the "State"), and more particularly described in the Lease (the "Leased Premises").

B.      Landlord is unwilling to enter into the Lease unless Guarantor agrees to guaranty the payment and performance of the obligations under the Lease in accordance with this Guaranty.

C.      Guarantor has an indirect ownership interest in Tenant and will, therefore, derive substantial and material benefit from the Lease.

D.      Guarantor hereby executes and delivers this Guaranty to Landlord in conjunction with Tenant's execution and delivery of the Lease to Landlord.

## AGREEMENTS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor agrees as follows:

1.      **Guaranty**.  Guarantor hereby unconditionally guarantees, jointly and severally, the full and prompt payment of all rent and other sums required to be paid by Tenant under the Lease, including, but not limited to, Base Rent, Crop Proceeds Rent and Capital Expenditure Assessment payments, as such terms are defined in the Lease (the "Guaranteed Payments") and the full and faithful performance of all terms, conditions, covenants, obligations and agreements contained in the Lease on the Tenant's part to be performed (the "Guaranteed Obligations").  This Guaranty will constitute a guaranty of payment and performance and not of collection.  In the event of Tenant's failure to punctually to pay and perform its obligations under the Lease, Guarantor does hereby agree punctually to make such payments and perform such obligations.

2.      **Guarantor's Representations and Warranties**.  Guarantor hereby warrants and represents unto Landlord as follows:

a.      Guarantor has full power and authority to execute, deliver, and perform its obligations under this Guaranty;

b.      that this Guaranty constitutes the legal, valid and binding obligation of Guarantor and is fully enforceable against Guarantor in accordance with its terms;

c.      Guarantor is solvent and the execution of this Guaranty does not render Guarantor insolvent.  Any and all financial statements, balance sheets, net worth statements and other

- 1 -

WBD (US) 55229910

Date: January 28, 2022                                                    R.E.# BP00008 - Bladen 53

financial data, if any, which have heretofore been furnished to Landlord with respect to Guarantor fairly and accurately present the financial condition of Guarantor as of the date they were furnished to Landlord and, since that date, there has been no material adverse change in the financial condition of Guarantor;

       d.     that there are no legal proceedings or material claims or demands pending against or, to the best of Guarantor's knowledge threatened against, Guarantor or any of its assets; and

       e.     that neither the execution nor the delivery of this Guaranty nor the fulfillment and compliance with the provisions hereof will (i) violate or conflict with any statute or rule of law applicable to Guarantor, Landlord or the Leased Premises; (ii) require the consent, approval, declaration or filing with, or notice to, or other action by any other person or entity; or (iii) conflict with, result in a breach of, constitute a default under, result in the creation of any lien, charge, or encumbrance upon any property or assets of Guarantor or create in any party the right to accelerate, terminate, modify or cancel under any agreement or instrument to which Guarantor is now a party or by which it may be bound.

3.     **Guarantor's Financial Statements**.  Guarantor shall annually provide to Landlord, personal financial statements and consolidated financial statements prepared by a certified public accountant for all entities owned or partially owned by Guarantor ("**Guarantor's Entities**"), due no later than October 31st of each year.  As soon as available after the applicable filing date for the tax reporting period, but no later than October 31st of each year, Guarantor shall provide to Landlord copies of Guarantor's Federal and other governmental tax returns, prepared by Guarantor's certified public accountant.

4.     **Costs and Expenses**.  Guarantor further promises to pay all of Landlord's costs and expenses (including without limitation reasonable attorneys' fees) incurred in endeavoring to collect the Guaranteed Payments or to enforce the Guaranteed Obligations or incurred in enforcing this Guaranty, as well as all damages which Landlord may suffer in consequence of any default or breach under the Lease or this Guaranty.

5.     **Actions Permitted Without Impairment**.  Landlord may at any time and from time to time, without notice to or consent by the Guarantor, take any or all of the following actions without affecting or impairing the liability and obligations of the Guarantor on this Guaranty:

       a.     grant an extension or extensions of time for payment of any Guaranteed Payment or time for performance of any Guaranteed Obligation;

       b.     grant an indulgence or indulgences in any Guaranteed Payment or in the performance of any Guaranteed Obligation;

       c.     modify or amend the Lease or any of its terms or any obligation of Tenant arising under the Lease;

       d.     consent to any assignments, sublease or subleases and successive assignments or subleases by Tenant;

Date: January 28, 2022                                    R.E.# BP00008 - Bladen 53

    e.       consent to an extension or extensions of the term of the Lease;

    f.       accept other guarantors; and/or

    g.       release any person primarily or secondarily liable under this Guaranty, the Lease or any other guaranty of the Lease.

6.    **Waiver of Certain Rights**.  Guarantor hereby waives all diligence in collection or in protection of any security, presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of any extensions granted or other action taken in reliance on this Guaranty and all demands and notices of any kind in connection with this Guaranty, any Guaranteed Payment or Guaranteed Obligation.

7.    **Acknowledgement of Lease**.  Guarantor hereby acknowledges full and complete notice and knowledge of all of the terms, conditions, covenants, obligations and agreements of the Lease.

8.    **No Right to Tenant's Rights**.  Payment by Guarantor of any amount pursuant to this Guaranty shall not in any way entitle the Guarantor to any right, title or interest (whether by subrogation or otherwise) of Tenant under the Lease or to any security being held for any Guaranteed Payment or Guaranteed Obligation.

9.    **Absolute Obligations**.  This Guaranty shall be continuing, absolute and unconditional and remain in full force and effect until all Guaranteed Payments are made, all Guaranteed Obligations are performed and all obligations of the Guarantor under this Guaranty are fulfilled.

10.    **Primary Obligations**.  The obligations and liability of Guarantor under this Guaranty shall be primary and shall survive whether or not the Lease or the obligations under the Lease are terminated.  Landlord shall have no obligation at any time to resort for payment to Tenant or to any other guaranty or to any security or other rights and remedies, and Landlord shall have the right to enforce this Guaranty irrespective of whether or not other proceedings or actions are pending or being taken seeking resort to, or realization upon, or from any of the foregoing.

11.    **Effect of Bankruptcy**.  This Guaranty shall continue to be effective or reinstated, as the case may be, if at any time the Lease is terminated or rejected or the Leased Premises is abandoned or any payment to Landlord of all or any part of the Guaranteed Payments or Guaranteed Obligations is rescinded or must otherwise be restored or refunded by Landlord, in each case pursuant to any insolvency, bankruptcy, reorganization, receivership or other debtor relief proceeding involving Tenant ("Bankruptcy Event").  In the event of a Bankruptcy Event, Landlord may accelerate all Guaranteed Payments under the Lease and require Guarantor to make such payments and such obligations shall be deemed direct and primary obligations under this Guaranty.  If Landlord must rescind or restore any payment received by Landlord in satisfaction of the Payment Obligations or Guaranteed Obligations, any prior release or discharge of the terms of this Guaranty given to Guarantor by Landlord shall be without effect, and this Guaranty shall remain in full force and effect.

12.    **Subordination and No Subrogation**.  If, for any reason whatsoever, Tenant now is or hereafter becomes indebted to Guarantor, such indebtedness and all interest thereon, shall, at all

- 3 -

Date: January 28, 2022                                    R.E.# BP00008 - Bladen 53

times, be subordinate in all respects to this Guaranty, and Guarantor shall not be entitled to enforce or receive payment thereof until the obligations under this Guaranty have been fully satisfied. Notwithstanding anything to the contrary contained in this Guaranty or any payments made by Guarantors, Guarantor shall not have any right of subrogation in or under the Lease or to participate in any way or in any right, title or interest in and to any of the Leased Premises, all such rights of subrogation and participation, together with any other contractual, statutory or common law right which Guarantor may have to be reimbursed for any payments Guarantor may make to Landlord pursuant to this Guaranty, being hereby expressly waived and released.

13.     **Waiver**.  Guarantor hereby waives:

a.      all notices of acceptance, protest, demand and dishonor, presentment, notice of nonpayment, notice of intention to accelerate, notice of default and all notices and demands of any kind now or hereafter provided for by any statute or rule of law, to the extent waivable;

b.      any and all requirements that Landlord institute any action or proceeding, or exhaust or attempt to enforce any or all of Landlord's right, remedies or recourses against Tenant or anyone else or in respect of the Leased Premises, or join Tenant or any other persons liable under the Lease or the obligations under this Guaranty in any action to enforce this Guaranty as a condition precedent to bringing an action against Guarantor upon this Guaranty;

c.      all suretyship defenses of every kind and nature; and

d.      any claim Guarantor might otherwise have against Landlord by virtue of Landlord's invocation of any right, remedy or recourse permitted it hereunder or under the Lease.

14.     **Delay Has No Effect**.  The liability of the Guarantor under this Guaranty shall not be affected or impaired by any failure or delay by Landlord in enforcing any Guaranteed Payment or Guaranteed Obligation or this Guaranty or any security therefor or in exercising any right or power in respect thereto, or by any compromise, waiver, settlement, change, subordination, modification or disposition of any Guaranteed Payment or Guaranteed Obligation or of any security therefor.

15.     **Successors and Assigns**.  This Guaranty also shall bind the heirs, personal representatives, successors and assigns of Guarantor and shall inure to the benefit of Landlord, its successors and assigns.

16.     **GOVERNING LAW; VENUE**.  THIS GUARANTY SHALL BE CONSTRUED ACCORDING TO THE LAWS OF THE STATE. ANY ACTION OR PROCEEDING AGAINST EITHER PARTY ARISING OUT OF OR RELATING TO THIS GUARANTY SHALL BE INSTITUTED IN ANY FEDERAL COURT IN THE STATE OR IN STATE COURT IN ANY COUNTY OF THE STATE IN WHICH A FEDERAL COURTHOUSE IS LOCATED, AND EACH PARTY WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH PARTY HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

Date: January 28, 2022                                    R.E.# BP00008 - Bladen 53

17.    **Construction**.  If this Guaranty is executed by more than one (1) person, all singular nouns and verbs herein relating to the Guarantor shall include the plural number, the obligations of the several guarantors shall be joint and several and Landlord may enforce this Guaranty against any one (1) or more guarantors without joinder of any other guarantor hereunder.

18.    **Severability**.  Landlord and the Guarantor intend and believe that each provision of this Guaranty comports with all applicable law.  However, if any provision of this Guaranty is found by a court to be invalid for any reason, the remainder of this Guaranty shall continue in full force and effect and the invalid provision shall be construed as if it were not contained herein.

19.    **Joint and Several Liability**.  If more than one person is included in the definition of Guarantor, the liability of all such persons hereunder shall be joint and several.

20.    **WAIVER OF JURY TRIAL**.  GUARANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF, BASED ON OR PERTAINING TO THIS GUARANTY.

21.    **Paragraph Headings**.  The paragraph headings inserted in this Guaranty have been included for convenience only and are not intended, and shall not be construed, to limit or define in any way the substance of any paragraph contained herein.

22.    **Notices**.  All notices delivered pursuant to this Guaranty shall be in writing and sent by registered or certified mail or overnight courier delivery at:

|  |  |
|---|---|
| **Landlord:** | Brown Pelican Farms LLC |
|  | c/o Manulife Investment Management Agriculture |
|  | 197 Clarendon Street |
|  | C-08-99 |
|  | Boston, MA 02116-5010 |
|  | Attn:  Managing Director |
|  |          Manulife Investment Management Agriculture |
|  |  |
|  | And: |
|  |  |
|  | Manulife Investment Management Agriculture Services Inc |
|  | 1803 Woodfield Drive Suite B |
|  | Savoy, IL, 61874 |
|  |  |
| **Guarantor**: | Bricklyn Rooks |
|  | 63 Hemlock Drive |
|  | Whiteville, NC 28472 |

*[Signature Page Follows]*

- 5 -

Date: January 28, 2022                                R.E.# BP00008 - Bladen 53

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the date first written above.


**GUARANTOR**

Witnesses:


_____          _____

                                           Name: Bricklyn Rooks, an individual


_____

# EXHIBIT B

# Poyner Spruill LLP

Matthew P. Weiner
Partner
D: 919.783.2954
mweiner@poynerspruill.com

October 9, 2025

VIA FIRST-CLASS, CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Carolina Blueberry Group, LLC
c/o Brick Rooks
63 Hemlock Drive
Whiteville, NC 28472

Brick Rooks
63 Hemlock Drive
Whiteville, NC 28472

Carolina Berry Group, LLC
c/o Brick Rooks
63 Hemlock Dr.
Whiteville, NC 28472

Laurie Biggs
9208 Falls of Neuse Road
Suite 120
Raleigh, NC 27615
lbiggs@biggslawnc.com

RE:  Notice of Termination of Contract Farming Agreement dated January 28, 2022 by and between Berry Capital Management, LLC ("BCM") and Carolina Blueberry Group, LLC (the "Grower")[1]:

Dear Laurie and Brick:

As you know, this firm represents BCM in connection with that certain Contract Farming Agreement dated January 28, 2022, by and between BCM and the Grower (the "Contract Farming Agreement").

BCM has previously notified the Grower of numerous defaults under the Contract Farming Agreement, including most recently by a Notice of Default and Reservation of Rights dated July 11, 2025.  The "Events of Default", as defined in that notice, have not been cured.

Pursuant to Paragraph 11 of the Contract Farming Agreement, BCM hereby terminates the Contract Farming Agreement effective immediately.

BCM expressly reserves all of its rights, remedies and claims against Grower under the Contract Farming Agreement and applicable law.  To the extent Grower is in possession of any farming

---

[1] This notice is addressed to Carolina Berry Group, LLC in accordance with the notice provisions under Section 13 of the Contract Farming Agreement.

equipment or other property owned by BCM, Grower is instructed to immediately turn over possession of such property to BCM.

If you have any questions regarding this letter, please contact me or have your counsel contact me immediately.

Yours very truly,

Matthew P. Weiner

Cc:     David Mills, Court-Appointed Limited Receiver (via e-mail only)

# EXHIBIT C

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**
**RALEIGH DIVISION**

**IN RE:**

**BERRY CAPITAL MANAGEMENT, LLC,**

**Debtor**

**Case No.  25-04002-5-JNC**

**Chapter 11**

**ORDER COMPELLING DEBTORS TO IMMEDIATELY ASSUME OR REJECT
UNEXPIRED LEASE AND GRANTING RELIEF FROM THE AUTOMATIC STAY TO
TERMINATE UNEXPIRED LEASE AND ENFORCE REMEDIES**

The Court having considered the motion (the "Motion")[1] of Brown Pelican Farms LLC,

("Landlord") for entry of an order: (1) Compelling the Debtors to Assume or Reject Unexpired

Lease and (2) Granting Relief from the Automatic Stay to Terminate Unexpired Lease and Enforce

---

[1] Capitalized terms not otherwise defined herein shall be given the meaning ascribed such terms
in the Motion.

Remedies, and having considered the Motion and oral argument, if any, and, for good cause shown, it is hereby:

ORDERED AND DETERMINED:

1.      The Motion is granted.

2.      Within two (2) business days after entry of this Order, the Debtors shall determine to either assume or reject the Lease, which rejection shall be effective the date that Landlord actually receives written notice of the Debtors' election.  Failure of the Debtor to provide written notice of the Debtor's election to Landlord within the time prescribed herein shall constitute an election of rejection.

3.      Should the Debtor elect to assume the Lease, the Debtor shall immediately pay to the Landlord the entire 2024 and 2025 Base Rent due under the Lease.

4.      The Landlord is hereby granted relief from the automatic stay in order to terminate the Lease and enforce any rights and remedies that it may have under the Lease.

5.      The provisions of Rule 4001(a)(3) of the Federal Rules of Bankruptcy Procedure are hereby waived so that Landlord can immediately exercise its rights and remedies under the Lease against the Debtor.

<div align="center">END OF DOCUMENT</div>